Alvio **DOMINGUEZ, Jr.,** **Plaintiff,**

v.

**MIAMI–DADE COUNTY, Defendant.**

No. 09–20003–CIV.

United States District Court,
S.D. Florida.

Oct. 20, 2009.

---

Lawrence Joseph McGuinness, Miami, FL, for Plaintiff.

Scott Bircher Mario, Miami, FL, for Defendant.

### ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment (dkt. # 30).

UPON CONSIDERATION of the Motion, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

### I. BACKGROUND

This case involves a firefighter who claims that he was denied a benefit of employment and was retaliated against because of his military service. Plaintiff Alvio Dominguez ("Dominguez") was hired in 1995 as a firefighter with the Miami–Dade Fire Rescue Department (the "MDFRD"). Def.'s Statement of Material Facts, ¶ 1.[1] Dominguez was also a member of the Florida Army National Guard during the period of his employment with the MDFRD. *Id.* On May 19, 1999, and November 12, 2000, Dominguez received counseling for failing to provide timely notification to MDFRD of his upcoming military duty. *Id.*, ¶ 3. These counseling events did not result in loss of pay or benefits and is not considered by MDFRD to be disciplinary action. *Id.*, ¶ 4.

On June 10, 1999, Dominguez was arrested and charged with driving under the influence with serious bodily injury to another. As a result, he was suspended

---

1. Citation to the Parties' Statements of Material Facts or other pleadings incorporate by reference citation to the underlying documents.

without pay from August 14, 1999, to August 29, 2000. *Id.*, ¶ 5. Dominguez was reinstated to duty on September 5, 2000. *Id.*, ¶ 6. He was given a 60–day disciplinary suspension and was compensated for the remainder of the time that he had been suspended without pay. *Id.* On November 22, 2001, Dominguez received a rating of "unsatisfactory" in his annual performance evaluation covering the period from December 14, 1998, to December 13, 1999. *Id.*, ¶ 7. Due to his rating of "unsatisfactory," Dominguez's merit increase for that year was deferred pursuant to Miami–Dade Administrative Order 7–19. *Id.*

On November 22, 2001, Dominguez received a rating of "needs improvement" for his annual performance evaluation covering the period from December 14, 1999, to December 10, 2000. *Id.*, ¶ 8. Due to his rating of "needs improvement," Dominguez's merit increase for that year was deferred pursuant to Miami–Dade Administrative Order 7–19. *Id.* Dominguez later successfully appealed both annual performance evaluations and he received retroactive merit increases for both evaluations. On January 6, 2002, Dominguez received his annual performance evaluation covering the period from December 10, 2000, to December 9, 2001. *Id.*, ¶ 10. He received a rating of "needs improvement" in the area of Work Habits, a rating of "satisfactory" in all other categories, and a rating of "satisfactory" overall. *Id.* He received a merit increase for that year. *Id.*

Dominguez was deployed to active military duty from January 16, 2003, to July 6, 2003. *Id.*, ¶ 14. On August 11, 2003, after he returned from military duty, he submitted a written request to take the Fire Lieutenant's exam.[2] *Id.*, ¶¶ 14–15. The exam was administered twice in 2003, on April 15, 2003, and July 24, 2003. At the time Dominguez submitted his request to take the exam, County policy precluded him from making up the April 15, 2003, exam. *Id.*, ¶ 15. On May 27, 2004, however, Dominguez was permitted to make up the exam that had been administered on July 24, 2003, but did not obtain a passing score. *Id.*, ¶ 16. Dominguez failed the exam a total of six times and never received a passing score. *Id.*, ¶ 12.

In October of 2005, Dominguez believed he was entitled to receive a longevity increase for completing 10 years of service. *Id.*, ¶ 19. He was advised that he was not eligible because his military service constituted a break in service. *Id.* After disputing that his military duty was a break in service, he was awarded the longevity increase retroactive to October of 2005. *Id.*, ¶ 20. Dominguez was deployed to active military duty in 2005 for three months. *Id.*, ¶ 21. During this period, deductions were taken from Dominguez's pay that he believed were improper. *Id.* Upon disputing these deductions, Dominguez received all the money that was deducted. *Id.*, ¶ 22.

On January 31, 2006, Miami–Dade Police Detective Gustave Bayas ("Detective Bayas") began an investigation into allegations that Dominguez had committed theft in connection with Miami–Dade County's tuition refund program. *Id.*, ¶ 26. This investigation revealed that between May 3, 2004, and August 27, 2005, Dominguez submitted requests for reimbursement of $22,620.00 tuition costs. *Id.*, ¶ 28. Dominguez's out-of-pocket tuition cost, however,

---

**2.** Promotions to Fire Lieutenant are determined in part by performance on the Fire Lieutenant's Exam. The exam consists of 125 multiple choice questions which test subjects including "fire science, apparatus and equipment, emergency medical techniques, policies and procedures, basic management and supervisory practices, and labor relations." Decl. of Therese K. Leahy, ¶ 4 (dkt. # 31–36).

was only $8,150.00 because he received other financial aid and discounts totaling $14,470.00. *Id.,* ¶ 29. Dominguez also submitted documents containing falsified tuition amounts. *Id.* As a result, he received tuition reimbursement overpayments totaling $7,235.00. Dominguez was arrested on March 28, 2007, and charged with eight counts of grand theft and eight counts of official misconduct. *Id.,* ¶ 30. On January 11, 2008, the MDFRD issued Dominguez a disciplinary action report for conduct unbecoming of a County employee. *Id.,* ¶ 33. He was terminated from his employment with the MDFRD on the same day. *Id.* On July 18, 2008, a jury found Dominguez guilty of all 16 counts. *Id.,* ¶ 34. The court withheld adjudication and ordered two years of probation, restitution of $7,910.00, 150 hours of community service, and completion of an anger management course. *Id.* Dominguez currently owes restitution of $1,653.14. *Id.*

On June 15, 2006, Dominguez filed a complaint against Miami–Dade County with the U.S. Department of Labor ("DOL") pursuant to the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). The complaint alleged "improper personal actions that inflict unequal treatment, failure to provide due process, reprisal, failure to investigate, and unlawful command influence against veterans." *Id.,* ¶ 24. On May 16, 2007, Dominguez filed a second USERRA complaint with DOL alleging retaliation carried out by "engag[ing] in acts of reprisals against [him] to include adverse disciplinary actions, acts in bad faith, lost [sic] of wages, and desperate [sic] treatment to include criminal action resulting from being arrested and relieved from duty without pay." *Id.,* ¶ 31. On October 23, 2007, Dominguez notified DOL that he was pur-

suing his claims through private counsel and DOL closed the case. *Id.,* ¶ 32; Aff. of Dominguez, ¶ 51.

On December 10, 2008, Dominguez filed a Complaint against Miami–Dade County [3] in the Circuit Court of the Eleventh Judicial Circuit in and for Miami–Dade County. The Complaint alleges USERRA violations against Miami–Dade County based on: 1) failure to permit Dominguez to take all the Fire Lieutenant exams that he missed while he was deployed on military duty; 2) giving him a different exam than the one actually administered while he was absent; 3) improperly scoring his exam; 4) denying him a longevity increase; 5) giving him negative annual performance evaluations; 6) counseling him concerning his military duty; 7) improperly making deductions from his pay while on military duty; 8) "[l]abeling Plaintiff a troublemaker or problem employee due to him filing the first USERRA complaint and being on military service and deployments;" and 9) terminating his employment. Second Am. Compl., ¶¶ 14, 18. On January 2, 2009, the case was removed to this Court. Notice of Removal (dkt. # 1). Plaintiff filed an Amended Complaint on April 14, 2009 (dkt. # 14). Plaintiff filed a Second Amended Complaint on June 9, 2009 (dkt. # 25).

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

**3.** All conduct of which Dominguez complains will be referred to as having been taken by Defendant Miami–Dade County, regardless of whether the action was actually taken by the County or the MDFRD.

movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury,* 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. ANALYSIS

Miami–Dade County contends that there are no genuine issues of material fact supporting Dominguez's USERRA claims.[4] Section 4311 of USERRA provides, in relevant part:

(a) A person who is a member of . . . a uniformed service shall not be denied . . . retention in employment, promotion, or any benefit of employment[5] by an employer on the basis of that membership, . . . performance of service, . . . or obligation.

(b) An employer may not discriminate in employment against or take an adverse action against any person because such person (1) has taken action to enforce a protection afforded under this chapter, . . . or (4) has exercised a right provided for in this chapter.

(c) An employer shall be considered to have engaged in actions prohibited—

(1) under subsection (a), if the person's membership . . . in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, [or] service; or

(2) under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter, . . . or (D) exercise of a right provided for in this chapter, is a motivating factor in the employer's action, unless the employer can prove that the action would

4. "Congress enacted USERRA to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military." *Coffman v. Chugach Support Servs., Inc.,* 411 F.3d 1231, 1234 (11th Cir.2005).

5. The term "benefit of employment" "means any advantage, profit, privilege, gain, status, account or interest (other than wages or sala-

ry for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights or benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2).

have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right.

38 U.S.C. § 4311.

■ To establish a prima facie case, a plaintiff must show by a preponderance of the evidence that his protected status was a motivating factor in the challenged action. *Coffman,* 411 F.3d at 1238. Of course, if the challenged action is not within the scope of conduct that USERRA proscribes, a plaintiff may not prevail on the claim. "A motivating factor does not mean that it had to be the sole cause of the employment action." *Id.* "Instead, it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Id.* (internal quotation marks omitted). Once an employee meets this burden, the burden shifts to the employer to demonstrate that the action would have been taken despite the employee's protected status. *Id.*

### A. *Fire Lieutenant's Exam*

Dominguez claims Miami–Dade County violated his USERRA rights because: (1) he was not permitted to take all the Lieutenant's Exams that he missed while on military duty; (2) he was administered an exam different from the one actually administered on July 24, 2003; and (3) the exam he was given was improperly scored.

### 1. Miami–Dade County's Refusal to Allow Dominguez to Take the April 15, 2003, Fire Lieutenant's Exam

■ As an initial matter, this Court must determine whether, and under what circumstances, taking the Fire Lieutenant's Exam is a "benefit of employment" within the meaning of USERRA. As it applies here, a "benefit of employment" is an advantage, privilege or gain that accrues by reason of an employment agreement. 38 U.S.C. § 4303(2). Passing the Fire Lieutenant Exam gives an employee an advantage or gain with respect to possible promotion to Fire Lieutenant. However, a person has not necessarily been deprived of an advantage or gain merely because he has not been afforded as many opportunities as other employees to be tested. This is particularly true when the opportunity to take the test is provided at reasonable intervals, such that a uniformed service member who missed the last test because of military service may take the test within a reasonable time. Thus, when military duty has deprived a uniformed service member of the opportunity to take an exam necessary to obtain a promotion or other advantage, the opportunity to be tested within a reasonable time constitutes a "benefit of employment." [6]

It is undoubtedly true that taking a test multiple times may increase one's chance of passing. Increasing one's chance of passing, however, depends largely on an exertion of effort by the test taker to improve testing performance. When a test is administered periodically, the interval between tests affords the test taker time to increase his ability to pass the test. It is not necessarily true, however, that a uniformed service member who seeks to take an exam that was missed due to military service is at a disadvantage vis-à-vis another test taker who had multiple opportunities to take the exams when they were actually administered. If the uniformed service member studied for the exam during the period of military service, reasonably prompt administration of the exam will cure, to the extent possible, any prejudice suffered by waiting until after

---

**6.** Here, this Court uses the word "advantage" in the same way as it is used in 38 U.S.C. § 4303(2).

the term of military service has concluded to take the exam. If the uniformed service member did not study while in service, a reasonable period of time after service would permit the individual to adequately prepare for the exam.

Once a uniformed service member takes an exam and fails, however, no prejudice results from barring him from immediately retaking the test for as many times as the test was administered while the individual was absent due to military service. There is no reason to believe that a person who takes a test and fails one day will pass a similar test the following day. There may be a greater likelihood of passing a consecutively administered test in cases where the test taker came close to passing the first time. However, denying an employee this opportunity is not so prejudicial as to constitute the denial of a "benefit of employment" within the meaning of USERRA, as long as the uniformed service member is afforded the opportunity to take the test within a reasonable time after returning from military service and is given a reasonable time to prepare. Therefore, Miami–Dade County did not deny Dominguez of a "benefit of employment" by refusing his request to make up the April 15, 2003, exam.

■ Even if Miami–Dade County's refusal to allow Dominguez to make up the April 15, 2003, exam was a denial of a "benefit of employment," Dominguez can-

not establish a prima facie case. Miami–Dade County refused to allow Dominguez to make up the April 15, 2003, exam because County policy prohibited administration of a Fire Lieutenant's Exam once the eligible list was exhausted or expired.[7] Leahy Decl., ¶ 16 (dkt. # 31–36). There is no evidence that this policy was not generally adhered to or that it was applied in a discriminatory manner towards uniformed service members. Thus, there is no evidence that Miami–Dade County would have granted his request, even if Dominguez did not have USERRA protection. Therefore, Miami–Dade County's refusal to allow Dominguez to make up the April, 15, 2003, Fire Lieutenant's Exam was not a USERRA violation.

2. Miami–Dade County's Administration of a Fire Lieutenant's Exam that was Different from the Exam Administered on July 24, 2003

■ Dominguez alleges that although Miami–Dade County allowed him to make up one of the exams that he missed, he was given a test that was different from the test actually administered on July 24, 2003.[8] As stated above, the "benefit of employment" to which Dominguez was entitled was the opportunity to be tested within a reasonable time after his military service concluded. Nevertheless, Dominguez was not entitled to take a particular exam. He was only entitled to take an

---

7. After the Fire Lieutenant's Exam has been administered, the Testing and Validation Section of the Recruitment, Compensation and Testing Division of the Miami–Dade County Human Resources Department prepares an eligible list of the test takers ranked in numerical order of their exam scores. Leahy Decl., ¶ 10. The eligible list remains valid for one year or until it becomes exhausted. *Id.* A list becomes exhausted when there are fewer than three qualified individuals on the list. *Id.*

8. Dominguez's contention that he was given a test different than the one actually adminis-

tered on July 24, 2003, is based on his representation that Therese Leahy ("Leahy"), the Manager of the Testing and Validation Section, told him that the July 24, 2003, test had been compromised and that he would be given a different test. Aff. of Dominguez, ¶¶ 27–28. Miami–Dade County has given no indication that it administered an exam to Dominguez that was different from the exam actually administered on July 24, 2003. The County, however, has not affirmatively disputed Dominguez's assertion that he was given a different test.

exam that qualified him for consideration as a Fire Lieutenant and permitted the accrual of any other corresponding benefits. Therefore, viewing the facts in the light most favorable to Plaintiff, Miami–Dade County's administration of a different exam does not constitute the denial of a "benefit of employment" covered by US-ERRA. Even if it did, however, Miami–Dade County has demonstrated that it would have made the same decision despite Dominguez's protected status because the Testing and Validation Section of the Recruitment, Compensation and Testing Division concluded that the substance of the July 24, 2003, exam had been compromised. Aff. of Dominguez, ¶ 27, sworn to September 18, 2009 (dkt. # 36). Accordingly, Miami–Dade County did not commit a USERRA violation based on Dominguez's allegation of having been administered a different test.

### 3. Scoring of the Fire Lieutenant's Exam

 Dominguez contends that the July 24, 2003, Fire Lieutenant's Exam that he took on May 27, 2004, was not the exam actually administered on July 24, 2003, and that it was improperly scored because the passing score from the test actually administered on July 24, 2003, was used to score his test. After a Fire Lieutenant's Exam is administered, a post-review panel reviews the exam and exam results to establish a cut-off passing score. Leahy Decl., ¶¶ 7–9. To establish a cut-off score, the panel "reviews the examination on the basis of item importance and level of difficulty." *Id.*, ¶ 7. "Statistical reports describing the psychometric properties of the test are generated and reviewed, ... reflect[ing] data such as the number of applicants, the number of items, the mean of

the exam, the mean item difficulty, low and high scores comparisons, reliability of the exam, pass point analysis report, and others." *Id.*, ¶ 7. Once this cut-off score is established, the raw passing score is converted to a uniform civil service system of reporting where the passing score is 70.00. *Id.*, ¶ 9. The applicant's raw scores are then converted to a final conversion score to determine if the test taker obtained a passing score of 70.00 or more. *Id.*, ¶ 9. Dominguez's raw score on the July 24, 2003, exam was 64 and his final converted score was 69.79. *Id.*, ¶ 12. He therefore failed the exam by 21 points.

As already stated, the opportunity to take a test that is required to obtain a promotion or other advantage within a reasonable time after serving military duty constitutes a "benefit of employment" within the meaning of USERRA, where the military service deprived the uniformed service member of the opportunity to take the test at an earlier time. However, if a test is administered within a reasonable time, but unfairly scored in a way that prejudices the test taker, the uniformed service member may still have been deprived of a "benefit of employment." Dominguez took and failed the Fire Lieutenant's Exam six times between May of 2001 and September 30, 2005. *Id.* The raw cut-off score for these exams, prior to their conversion to the uniform civil service system passing score of 70.00, ranged between 69 and 75.[9] *Id.* Thus, in most cases, the raw cut-off score was higher than the converted passing score. On two occasions, however, the converted score was equal to, or less than, the raw cut-off score.

The raw cut-off score for the exam actually administered on July 24, 2003, was 74.

---

**9.** The raw cut-off scores for the exams that Dominguez took are as follows: 1) May 23, 2001–75; 2) May 22, 2002–75; 3) July 24, 2003–74; 4) August 2, 2004–72; 5) April 27, 2005–70; and 6) September 30, 2005–69.

*Id.* If the test administered to Dominguez on May 27, 2004, was the test actually administered on July 24, 2003, and the test was scored using the same converted passing score as was used when the test was given before, then Dominguez would have failed the test because he achieved a final converted score of 69.79. If, however, Dominguez was given a different test that was scored using the converted passing score of the July 24, 2003, exam, this would cast doubt on the fairness of the exam for at least two reasons. First, the raw cut-off score of one exam is not applicable to a different exam because the metrics used to establish the cut-off score are based on the particularities of each exam. Second, even though a raw score of 64 was insufficient to pass the July 24, 2003, exam, it is possible that a raw score of 64 would be sufficient to pass a different exam that had a lower raw passing score. For example, the September 30, 2005, exam had a raw passing score of 69. *Id.,* ¶ 12. In contrast, the May 23, 2001 and May 22, 2002, exams both had raw passing scores of 75. Thus, it is possible that if Dominguez was given an exam with a lower raw passing score, his score of 64 would have been enough to pass, but for the application of the higher cut-off score from the July 24, 2003, exam. This raises a more than *de minimus* possibility that Dominguez may have been unfairly denied of a "benefit of employment."

Nevertheless, with respect to the administration and scoring of the exam, the record is devoid of any evidence that this alleged denial of a "benefit of employment" was motivated by Dominguez's status or service as a uniformed service member. While the circumstantial nature of Dominguez's evidence of USERRA violations is in no way fatal to his claims, there is simply no evidence, direct or circumstantial, that could lead a reasonable juror to conclude that Miami–Dade County's decision to administer and score the exam in the way that it did was even partly motivated by his status or service as a uniformed service member. Thus, even viewing the facts in the light most favorable to Dominguez, summary judgment in favor of Miami–Dade County is warranted on the issue of whether Miami–Dade County unfairly scored the exam he took on May 27, 2004.

### B. *Longevity Increase*

█ Dominguez claims that Miami–Dade County violated his USERRA rights by initially denying his longevity increase on grounds that his military service constituted a break in service. Miami–Dade County claims, and Dominguez does not deny, that he ultimately received his longevity increase retroactive to October of 2005. Def.'s Statement of Material Facts, ¶ 20; Pl.'s Statement of Material Facts, ¶ 20. Although Dominguez concedes that he received all of the pay he was entitled to pursuant to his longevity increase, he claims that he is owed interest on the amount paid retroactively. Miami–Dade County's initial denial of his longevity increase denied Dominguez of a "benefit of employment" because of his service as a uniformed service member. Thus, Dominguez is entitled to interest on the amount of wages that Miami–Dade County withheld. *See Serricchio v. Wachovia Securities, LLC,* 606 F.Supp.2d 256, 267 (D.Conn. 2009) (awarding prejudgment interest on award of back pay for USERRA violation); *Saulpaugh v. Monroe Comm. Hosp.,* 4 F.3d 134, 145 (2d Cir.1993) (stating that "given that the purpose of backpay is to make the plaintiff whole, it can only be achieved if interest is compounded").

If this Court concluded that Dominguez was entitled to back pay for a USERRA violation, there is no doubt that he would be entitled to prejudgment interest on the amount awarded in order to make him

whole. Likewise, it follows that Dominguez is entitled to interest on wages that Miami–Dade County withheld and later concluded he was retroactively entitled to. Therefore, Dominguez is entitled to receive interest on the unpaid wages attributable to his longevity increase from October of 2005 until the time he was paid.

### C. *Annual Performance Evaluations*

Dominguez claims that Miami–Dade County violated USERRA by giving him negative annual performance evaluations. An employer's failure to give a positive annual performance evaluation because of the employee's status or service as a uniformed service member, where a positive evaluation was otherwise warranted, constitutes a USERRA violation. *See* 38 U.S.C. § 4311(a). Dominguez received an annual performance evaluation of "unsatisfactory" for the period covering December 14, 1998, to December 13, 1999. The reason for the "unsatisfactory" rating was that Dominguez had been suspended without pay during this period for driving under the influence with serious bodily injury to another and was still under suspension at the end of the rating period. Def.'s Statement of Material Facts, ¶ 7. His merit increase for that year was deferred. Dominguez received a rating of "needs improvement" for the period covering December 14, 1999, to December 10, 2000. The reason for the "needs improvement" rating was because Dominguez was under suspension for most of the rating period. *Id.,* ¶ 8. His merit increase for that year was again deferred. He later appealed and received retroactive merit increases for both evaluation periods. Dominguez does not dispute that he received retroactive merit increases but contends that he is entitled to interest.

■ Miami–Dade County's initial decision to deny Dominguez's merit increases, based on his annual performance evaluations, was not a USERRA violation because there is no evidence of a nexus between his annual performance ratings and his status or service as a uniformed service member. Given that Dominguez had been suspended and was given disciplinary action for committing a serious offense, which affected his performance during the years in question, no reasonable juror could conclude that but for Dominguez's military service or obligation, he would have received a higher annual performance rating. Therefore, Miami–Dade County is entitled to summary judgment on the annual performance evaluation USERRA claim.

### D. *Counseling Concerning Military Duty*

■ Dominguez claims that counseling he received concerning his military service was a USERRA violation. In Miami–Dade County, formal or informal counseling is not disciplinary action. *Id.,* ¶ 4. It is viewed as a preventive effort to improve performance and avoid disciplinary action. *Id.* No evidence has been presented that the counseling Dominguez complains of deprived him of a "benefit of employment." Thus, there is no genuine issue of material fact and Miami–Dade County is entitled to summary judgment on Dominguez's USERRA counseling claim.

### E. *Wage Deductions During Military Service*

■ Dominguez claims that Miami–Dade County improperly took deductions from his pay while he was performing military service. Miami–Dade County claims that all improper deductions were returned and Dominguez does not dispute this. Def.'s Statement of Material Facts, ¶ 22; Pl.'s Statement of Material Facts, ¶ 22. Dominguez, however, claims that he is entitled to interest on the deductions.

Miami–Dade County did not commit a US-ERRA violation by making the challenged deductions because there is no evidence in the record that Miami–Dade County improperly deducted amounts from Dominguez's pay because of his status or service as a uniformed service member. Without more, the mere fact that the deductions were made while Dominguez was on military duty could not lead a reasonable juror to conclude that the deductions constituted a USERRA violation. Therefore, Miami–Dade County is entitled to summary judgment on Dominguez's wage deduction USERRA claim.

### F. *Retaliation*

▉ Dominguez claims that he was labeled a troublemaker and was terminated in retaliation for filing his first USERRA complaint with DOL. Dominguez was terminated on January 11, 2008, for "conduct unbecoming a County employee," which referred to his arrest for grand theft and official misconduct, charges on which he was later convicted. Def.'s Statement of Material Fact, ¶ 33. In light of Dominguez's arrest and subsequent conviction by a jury, notwithstanding the court's withholding of adjudication, and given the paucity of evidence suggesting any denial of a "benefit of employment" on account of Dominguez's status or service as a uniformed service member, no reasonable juror could conclude that Miami–Dade

County's decision to terminate him was motivated in part by his protected status.

Furthermore, Dominguez's claim that he was labeled a trouble maker does not allege specific conduct. Aside from his termination, the challenged conduct occurred before Dominguez filed his first USERRA complaint with DOL and cannot serve as the basis of a retaliation complaint. Even if there were individuals in the MDFRD who took issue with the time Dominguez committed to military service, Dominguez does not specifically allege any additional conduct that denied him of a "benefit of employment." Therefore, there is no genuine issue of material fact that Miami–Dade County did not retaliate against Dominguez.[10] Accordingly, summary judgment in the County's favor on the retaliation claim is warranted.

### G. *Miami–Dade County's Counterclaims for Conversion and Civil Theft*

Miami–Dade County alleges it is entitled to summary judgment on its conversion and civil theft counterclaims.[11] Section 775.089(8), Florida Statutes, provides:

> The conviction of a defendant for an offense involving the act giving rise to restitution under this section shall estop the defendant from denying the essential allegations of that offense in any subsequent civil proceeding. An order

---

10. Dominguez appears to challenge as retaliatory the manner in which Miami–Dade County investigated his suspected criminal conduct. The record, however, is devoid of any evidence that Miami–Dade County investigated Dominguez for any reason other than a good faith belief that he was engaging in criminal conduct, which ultimately proved to be accurate.

11. This Court asserts supplemental jurisdiction over Miami–Dade County's counterclaims. "Section 1367(a) authorizes a court to hear supplemental claims to the full extent

allowed by the case or controversy standard confers supplemental jurisdiction over all state claims that arise out of a common nucleus of operative fact with a substantial federal claim." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 742–43 (11th Cir.2006) (internal quotation marks omitted). This Court concludes that because Dominguez's retaliation claim challenges his termination for grand theft and official misconduct, Miami–Dade County's counterclaims for conversion and civil theft arise from a common nucleus of operative fact.

of restitution hereunder will not bar any subsequent civil remedy or recovery, but the amount of such restitution shall be set off against any subsequent independent civil recovery.

Dominguez was convicted by a jury of grand theft and official misconduct on July 18, 2008. *See Smith v. Bartlett,* 570 So.2d 360, 361 (Fla. 5th DCA 1990) (finding that conviction means a determination of guilt by a jury verdict or guilty plea and does not require adjudication by the court). Restitution was ordered in the amount of $7,910.00. Therefore, Dominguez is estopped from denying the essential allegations of his conviction for grand theft and official misconduct in this civil proceeding.

■ Section 772.11(1), Florida Statutes, provides that "[a]ny person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of [§ 812.14, Florida Statutes,] has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to ... reasonable attorney's fees and court costs." A person claiming injury under this section must make a written demand for treble damages prior to filing the claim. § 772.11(1), Fla. Stat. Miami–Dade County sent a written demand to Dominguez for treble damages on April 15, 2009. Def.'s Statement of Material Facts, § 37. There is no genuine issue of material fact that Miami–Dade County's civil theft and conversion claims are established by clear and convincing evidence based on the essential elements of Dominguez's conviction for grand theft and official misconduct. Accordingly, Miami–Dade is entitled to summary judgment on these claims in the amount of $21,705.00, which equals three times the amount of the theft. This amount shall be offset by $6,256.86, the amount that Dominguez has already paid.

## IV. CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (dkt. # 32) is GRANTED IN PART. The Clerk of the Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT. Within seven days of the date of this Order, the Parties shall stipulate to the amount of interest to which Plaintiff is entitled and submit a proposed final judgment.