# United States Court of Appeals
## For the First Circuit

No. 08-2530

SEGUNDO MELÉNDEZ-GARCÍA,

Plaintiff, Appellant,

v.

JORGE L. SÁNCHEZ; GEORGE V. HILLYER;
CARLOS G. RAMOS-BELLIDO; JIMMY TORRES;
ARTEMIO DE JESÚS; JOHN DOE; A-Z INS. CO.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Barbadoro,[*] District Judge.

Luis A. Meléndez-Albizu, with whom Gerardo De Jesús-Annoni and
Law Offices of Luis A. Meléndez-Albizu were on brief, for
appellant.
Efraín Maceira-Ortiz, for appellees.

December 10, 2010

---

[*] Of the District of New Hampshire, sitting by designation.

**TORRUELLA**, <u>**Circuit Judge**</u>.  On April 30, 2001, Segundo Meléndez-García ("Meléndez"), a Reserve Officers' Training Corps ("ROTC") officer, was assaulted during a student protest on the University of Puerto Rico's Río Piedras campus ("the UPR-RP campus").  Due to the university's non-confrontation policy, Puerto Rico Police Department ("PRPD") officers were unable to come to his aid.  In April 2002, Meléndez sued various university officials pursuant to 42 U.S.C. § 1983, alleging, among other things, that they had violated the equal protection and due process clauses of the Fourteenth Amendment by failing to protect him from injury.  He also asserted various state-law claims.  After protracted discovery, the district court granted the defendants' motion for summary judgment on the federal-law claims and dismissed the state-law claims because it concluded that the parties were not diverse.

Meléndez now contends that the district court (1) abused its discretion twice when ruling on discovery motions -- first, by refusing to issue sanctions under Fed. R. Civ. P. 37 for the defendants' alleged "massive discovery misconduct," and second, by failing to grant Meléndez's motion to set aside summary judgment based on the same discovery misconduct; (2) improperly dismissed Meléndez's federal civil rights claims on the ground of qualified immunity; and (3) committed clear error in determining that there was no diversity jurisdiction.  For the reasons stated hereinafter, we affirm all of the district court's rulings.

-2-

# I. Background

## A. Facts

### 1. The Non-Confrontation Policy

Historically, relations between ROTC members and some non-ROTC students at UPR have been marked by conflict and tension. For example, during a 1969 protest sparked by the imposition of a one-year sentence on a defendant who refused to submit to induction into the armed forces, students at UPR-RP marched into an ROTC building and proceeded to burn and otherwise destroy doors, windows, and glass display cabinets, among other things. During subsequent days, multiple ROTC cadets were assaulted and threatened. As a result of this violence, the university suspended Army ROTC classes for approximately three months. After one protest in 1971, an ROTC cadet was killed. In 1984, a bomb was discovered in the ROTC facility.

In response to the violence and confrontation on the UPR-RP campus, former chancellor Dr. Juan R. Fernández issued a statement encapsulating what came to be known as the "non-confrontation policy" ("NCP"). The policy evolved over time, and was eventually issued in written form in 2005. The translation of the preamble to the written NCP notes,

> The University of Puerto Rico, and particularly the Río Piedras Campus, historically has been the reflection and participant of [sic] the fundamental duties and conflicts of the Puerto Rican society. In some cases[,] events happened that generated

-3-

> tragic results for the University and the country. These events led us as university members to the introspection and search of [sic] some understanding as to how to avoid violence, the entrance of the Police to [sic] the University and the external improper intervention in the University affairs.

The body of the policy explains that the university community is committed to avoiding confrontation by, among other things, establishing as "institutional policy" a practice of "us[ing] all available resources to avoid the intervention of the Puerto Rico Police in university affairs." Although the NCP was not issued in written form until 2005, the parties agree that the unwritten NCP that was in force in 2001 prohibited PRPD officers from entering the campus without the permission of a university administrator.[1]

### 2. The Assault on Meléndez

During the months leading up to Meléndez's assault, the tensions between non-ROTC students and ROTC members were evident. The Navy's use of Vieques for weapons testing sparked many anti-Navy demonstrations on campus. In February 2001, the President of UPR-RP's student government wrote a letter demanding that ROTC members not be allowed to wear uniforms on campus. In April 2001, two non-commissioned officers ("NCOs") who went to the UPR-RP campus to pick up mail were harassed and threatened by ROTC

---

[1] Defendants claim that the chancellor of UPR-RP was the only person authorized to call the PRPD to campus; Meléndez claims that the President of UPR could override the determination of a chancellor on this issue.

opponents. ROTC officers and NCOs were regularly harassed and threatened when they wore their uniforms on campus.

On April 30, 2001, the day of the assault, defendant Dr. George Hillyer, who was then the chancellor of UPR-RP, had planned to be away from the campus. He had confirmed with a student group before leaving that no demonstrations were planned for that day. At 5:30 that morning, several ROTC cadets and NCOs began to perform physical training exercises in the UPR track and field area. A number of protesters began demonstrating on a bridge that leads to this area. In response, the officers in charge, Major Jorge Más and Lt. Col. José Martínez, decided to move the exercises to the ROTC compound. The protesters, however, also moved. As a result, cadets and officers were prohibited from entering or leaving the compound.[2] Protesters intercepted and beat up one cadet who attempted to flee through a hole in a fence. The demonstrators also hurled rocks, eggs, and mangoes at the compound.

At some point, Sgt. José L. González arrived on the scene. As he stood inside a gazebo near a parking lot, a group of demonstrators spotted him and proceeded to push and shove him. Lt. Col. José Miguel Pizarro, who believed that one of his men was in danger, moved toward the gazebo to provide assistance. At that point, Meléndez entered the fray to assist Pizarro, his commanding officer. González was able to get into his car and drive away, but

---

[2] One ill cadet, however, was permitted to leave.

-5-

Pizarro and Meléndez were left in the middle of a group of demonstrators, who began to kick and hit them. As the two men walked across the parking lot, a distance of about 150 meters, demonstrators continued to punch and kick them. According to Meléndez, the protesters dissipated after he threatened to press federal charges.

After the protest, Meléndez asked a PRPD officer why he had not intervened, and the officer responded that the university had not authorized entry. Although neither the Campus Guard nor the PRPD arrested or detained any of the protesters, federal authorities eventually arrested Pedro Colón Almenas. Colón Almenas was charged with, and found guilty of, assaulting a federal officer.

## B. Procedural History

Meléndez filed suit in federal court on April 30, 2002. In October 2004, after two years had passed without any reports to the court on the status of the case, the court ordered Meléndez to show cause as to why his case should not be dismissed for lack of prosecution. After Meléndez complied, the court decided not to dismiss the case but warned Meléndez that he had to keep the court apprised of the status of the case and bring any discovery disputes to the court without delay. On January 10, 2005, the parties submitted a discovery plan, proposing to coordinate discovery in the present case and a parallel state court action. The court

rejected this plan, and set the discovery deadline for May 15, 2005. The discovery deadline was later extended until August 15, 2005.

On September 7, 2005, the defendants filed for summary judgment. On November 28, 2005, as part of discovery in the parallel state case, the defendants informed Meléndez that approximately 390,390 pages of documents were available for review. Believing that these documents were relevant to his federal suit, Meléndez filed a motion requesting that the court enter a default judgment against the defendants, or else impose other "severe sanctions" under Rule 37. The court declined, without explanation, to take either action. Meléndez now argues that the district court abused its discretion in denying his motion. See Section II.A.ii, infra.

On August 23, 2007, the court filed its order granting summary judgment to the defendants on their federal claims. See Meléndez-García v. Sánchez, No. 02-1646, slip op. at 32 (D.P.R. filed Aug. 23, 2007) ("Meléndez I"). Meléndez appeals this judgment. See Section II.B, infra.

The court declined to rule on the state-court claims in its August 23, 2007 order, instead ordering Meléndez to provide evidence of his domicile as of April 30, 2002 so that the court could determine whether it had diversity jurisdiction. After Meléndez produced the required evidence, the court concluded that

he was not a Texas domiciliary as of the date he filed his complaint, and thus that there was no diversity of citizenship between him and the defendants. See Meléndez-García v. Sánchez, No. 02-1646, Doc. No. 243, slip op. at 1 (D.P.R. Sept. 30, 2008) ("Meléndez III"). Meléndez appeals this dismissal. See Section II.C, infra.

The same day that it ruled on the jurisdiction issue, the court denied Meléndez's motion for reconsideration of the summary judgment order. See Meléndez-García v. Sánchez, No. 02-1646, Doc. No. 242, slip op. at 1 (D.P.R. Sept. 30, 2008) ("Meléndez II"). Meléndez now claims that the district court erred in refusing to set aside its summary judgment ruling and allow the parties to continue discovery given the alleged discovery abuse. See Section II.A.iii, infra.

## II. Discussion

### A. Discovery Abuse

Meléndez makes two related claims regarding discovery: (1) the district court abused its discretion in refusing to grant a Rule 37 sanction -- either an entry of default or another exclusionary remedy -- after the defendants failed to produce certain documents in a timely fashion, and (2) the district court abused its discretion in refusing to set aside its summary judgment given the defendants' failure to produce those same documents.

After a brief discussion of the facts upon which these claims are based, we address, and reject, each of them in turn.

### 1. Background

Pursuant to a state court order, the defendants informed Meléndez on November 28, 2005 that approximately 390,390 pages of new documents were available for review. This set of documents, produced in response to a state discovery request that was apparently broader than the federal request, see Meléndez II, slip op. at 5 n.4, included a 1970 Report by the Puerto Rico Civil Rights Commission on the ROTC program at UPR.[3] The 1970 Report documents various incidents of harassment of and violence against ROTC members. Meléndez argues that this document, as well as the remainder of the 390,390 pages of documents in the set, should have been disclosed both as part of the defendants' Rule 26 mandatory disclosures and in response to Meléndez's August 15, 2005 federal discovery request, which asked for "[a]ll documents, objects or things evidencing communications between the ROTC and the UPR or UPR-RP regarding incident[s] of harassment at the UPR-RP against ROTC-RP cadets, officers and non-commissioned officers from 1965 until the present." Although he opened only one of the boxes that the defendants had made available to him, Meléndez claims that it

---

[3] Previously, in December 2004 and January 2005, the defendants informed Meléndez that large numbers of ROTC-related documents were available for inspection at the UPR archives. Meléndez II, slip op. at 5 n.4. These documents were apparently produced in response to the state court discovery request. Id.

was "clear that [the] boxes contained evidence of the historic discrimination suffered by the ROTC at the UPR-RP Campus,[4] that Defendants knew long ago about the existence of all these documents," and that they therefore should have been disclosed earlier as part of the federal discovery process. Meléndez filed his opposition to the defendants' motion for summary judgment on January 5, 2006.

## 2. Refusal to Grant Rule 37 Sanctions

On December 19, 2005, Meléndez filed a motion requesting an entry of default or severe sanctions based upon the defendants' "massive discovery misconduct." The court denied this request, without explanation, on January 20, 2006. Meléndez now claims that the district court erred in refusing to grant the request. District court determinations regarding the "selection and imposition" of sanctions are reviewed for abuse of discretion. Barreto v. Citibank, N.A., 907 F.2d 15, 16 (1st Cir. 1990) (per curiam).

Even assuming that at least some of the 390,390 pages were responsive to Meléndez's federal discovery request, we conclude that the district court did not abuse its discretion in failing to grant Meléndez's request for a Rule 37 sanction. The plain language of Rule 37(b) provides that before a court can impose sanctions, the offending party must "fail[] to obey an order

---

[4]  A number of the boxes in the collection were labeled "ROTC."

to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A); see also Local Union No. 251 v. Town Line Sand & Gravel, Inc., 511 F.2d 1198, 1199 (1st Cir. 1975) ("Federal Rule 37 empowers a district court to make such orders as 'are just' when a party fails to comply with a discovery order . . . ."). [5]  Here, Meléndez cannot

---

[5]  Meléndez cites a leading treatise for the proposition that "Rule 37(d) allows the imposition of sanctions against a party for especially serious disregard of the obligations imposed by the discovery rules even though it has not violated any court order." 8B Charles Alan Wright et al., Federal Practice and Procedure § 2291, at 630 (3d ed. 2010).  The First Circuit has

> recognize[d] that in Rule 37(d) jurisprudence . . . , there are differences of opinion as to whether an award of sanctions is proper only where there has actually been a total failure to respond or whether sanctions might be imposed where a response has eventuated, but is so flawed as to be tantamount to no response at all.

R.W. Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 18 n.7 (1st Cir. 1991) (citations omitted).  We need not resolve this dispute, however, because even under the more expansive view of Rule 37(d), the defendants' delay was not an "especially serious disregard of the obligations imposed by the discovery rules" such that it was tantamount to a total failure to produce discovery.  8B Wright et al., supra, § 2291, at 630.

In addition, Meléndez argues that the district court could have issued an order excluding the defendants' evidence under Rule 37(c) despite the fact that the district court never issued an order to compel the production of the documents.  Rule 37(c) provides as follows:

> (1) . . . If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> . . .
> (C) may impose other appropriate sanctions, including any

-11-

point to any "order to provide or permit discovery" that could form the basis of a Rule 37 sanction.[6]  Thus, the district court's decision to deny Meléndez's motion was correct.

---

    of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).  It is not clear why Meléndez is arguing that the district court should have excluded the documents; his concern is that he was not given enough time to examine possibly helpful evidence, not that the defendants were able to use evidence that he had not had an adequate opportunity to examine.  Even assuming, however, that Meléndez is invoking Rule 37(c) in order to argue that the sanctions listed in Rule 37(b) should have been available to him despite the lack of a court order because of the provision in Rule 37(c)(1)(C) that allows Rule 37(b) sanctions when a party fails to make the required automatic disclosures under Rule 26(a), he still cannot prevail.  In light of the 2000 amendments to Rule 26(a), a party need only turn over "material that the possessing party might intend to use to support its claims or defenses." Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 34 n.10 (1st Cir. 2004).  Meléndez has not provided any evidence that the 390,390 pages of documents included material that the defendants "might intend to use to support [their] claims or defenses." Id. Therefore, any claim relying on the assertion that the defendants failed to disclose materials whose automatic disclosure was required by Rule 26(a) will fail.

[6]  Although Meléndez does not point to any such order in his appellate brief, his motion requesting a Rule 37 sanction does cite an order, dated September 15, 2005, that he believes fulfills the requirements of Rule 37.  In this order, the district court denied the defendants' motion for an extension of time to answer or otherwise object to the plaintiff's first set of interrogatories and first and second requests for admission.  In addition, the district court denied the plaintiff's request to deem as admitted his first and second requests for admission.  The docket notes that the court "grant[ed] ten (10) additional days for Defendants to produce interrogatories and requests for admissions."  This order is not sufficient to serve as a basis for relief under Rule 37(b) because it does not address production of documents and cannot be construed as an order compelling such production.

### 3. Refusal to Set Aside Summary Judgment

Meléndez next attacks the district court's September 30, 2008 order denying the plaintiff's request for reconsideration of its previous summary judgment determination (i.e., Meléndez II).[7] Meléndez claims that he was not given an adequate opportunity to discover facts supporting his claim because the defendants did not inform him of the existence of the 390,390 pages of new documents until November 28, 2005. We review a district court's denial of a plaintiff's motion to reconsider for abuse of discretion. See Douglas v. York County, 360 F.3d 286, 290 (1st Cir. 2004).

The essential problem with this claim is that the law upon which Meléndez bases his claim is not applicable to the circumstances of his case. Meléndez cites Carmona v. Toledo, 215 F.3d 124, 133-35 (1st Cir. 2000), and Resolution Trust Corp. v. North Bridge Associates, Inc., 22 F.3d 1198, 1202-09 (1st Cir. 1994), for the proposition that this court may reverse summary judgment and order further discovery where discovery was not completed due to a moving party's misconduct. It is true that we may do so. These cases, however, involve situations where (1) a party believed it needed to conduct further discovery to marshal

---

[7] To the extent that Meléndez is simply arguing that Meléndez II was incorrect because the district court failed to conclude that the court's January 20, 2006 ruling was in error, we reject that claim. As explained above, we conclude that the January 2006 ruling was proper because Meléndez cannot point to any court order that the defendants disobeyed.

facts necessary to oppose summary judgment, (2) that party filed a Rule 56(f) motion requesting additional time,[8] and (3) the court did not grant the party's request.  See Carmona, 215 F.3d at 133 ("Despite plaintiffs' Rule 56(f) motion and repeated references to the incompleteness of discovery, the district court did not make findings or hold a hearing as to the diligence and sufficiency of the [defendants'] responses."); Resolution Trust, 22 F.3d at 1204 ("The main battleground between the parties is the [appellants'] third . . . Rule 56(f) motion, which rested on a claim of delayed discovery still outstanding.").

Meléndez's facts do not fit into this framework because the district court did not deny any Rule 56(f) motion that he filed, or anything that could be construed as sufficient to invoke the protections of Rule 56(f).  See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir. 1988).  He did file three motions for extensions of time after he was alerted to the existence of the 390,390 pages of documents, but the court

---

[8]  "Fed. R. Civ. P. 56(f) describes a method of buying time for a party who, when confronted by a summary judgment motion, can demonstrate an authentic need for, and an entitlement to, an additional interval in which to marshal facts essential to mount an opposition."  Resolution Trust, 22 F.3d at 1203.  In general, a party seeking additional time to conduct discovery under Rule 56(f) must "show[] by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(f).  In "the absence of a formal Rule 56(f) affidavit[,]" however, an "alternative proffer" may be an adequate substitute if certain prerequisites are met.  See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir. 1988).

granted these extensions. Meléndez ultimately had more than a month to review the documents before filing his opposition to the motion for summary judgment. The only motion that the district court denied that related to Meléndez's allegedly inadequate opportunity to conduct discovery was Meléndez's order requesting default judgment or other severe sanctions. That motion, however, did not request more time, and therefore cannot justify a reversal under the case law that Meléndez cites.

## B. Section 1983 Violations

### 1. The Substantive Due Process Claim

Meléndez argued below that the defendants violated his right to substantive due process by increasing his risk of danger on campus and then failing to protect him against that risk. The defendants replied by arguing, among other things, that they were entitled to qualified immunity from suit under section 1983. The district court, in accordance with Saucier v. Katz, 533 U.S. 194, 200-01 (2001), overruled in part by Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), began its qualified immunity analysis by assessing whether, when viewed in the light most favorable to Meléndez, "the facts alleged show the [defendants'] conduct violated a constitutional right." Id. at 201. It concluded that they did not, and that the defendants were entitled to qualified immunity, because neither the defendants' actions surrounding the April 30, 2001 demonstration nor their implementation of the NCP constituted

-15-

conduct that would "shock the conscience." Meléndez I, slip op. at 23-24.

We review the lower court's qualified immunity determination de novo. Walden v. City of Providence, 596 F.3d 38, 52 (1st Cir. 2010). Because this is an appeal from a denial of summary judgment, we review the evidence, to the extent necessary, in the light most favorable to Meléndez. See, e.g., Asociación de Periodistas de P.R. v. Mueller, 529 F.3d 52, 55 (1st Cir. 2008). "We may affirm . . . on any basis apparent in the record." Chiang v. Verizon New England, Inc., 595 F.3d 26, 34 (1st Cir. 2010).

"Officials are entitled to qualified immunity unless (1) 'the facts that a plaintiff has alleged or shown make out a violation of a constitutional right' and (2) 'the right at issue was "clearly established" at the time of [the defendants'] alleged misconduct.'" Walden, 596 F.3d at 52 (quoting Pearson, 129 S. Ct. at 816). In light of Pearson, we may now address the second prong of the qualified immunity test first. See 129 S. Ct. at 818. We follow that course here.

This second prong has "two aspects": (1) "whether, based on the 'clarity of the law at the time of the alleged civil rights violation,' '"[t]he contours of the right . . . [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right,"'" Walden, 596 F.3d at 52 (alteration in original) (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st

-16-

Cir. 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987))), and (2) "whether, based on the 'facts of the particular case,' a 'reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" Id. (quoting Maldonado, 568 F.3d at 269). The "'relevant, dispositive inquiry'" in determining whether a right was "clearly established" is "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. at 53 (quoting Saucier, 533 U.S. at 201).

We conclude that it would not have been clear to a reasonable UPR official that the conduct at issue here was unlawful. "As a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). "The DeShaney Court . . . recognized a limited exception to this rule which applies to circumstances in which the government has a 'special relationship' with the individual because government action has deprived that individual of the liberty needed to protect himself." Vélez-Díaz v. Vega-Irizarry, 421 F.3d 71, 79 (1st Cir. 2005). This exception may apply "'when the individual is incarcerated or is involuntarily committed to the custody of the state.'" Id. at 80 (quoting Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005)). "In addition to the special 'custodial'

-17-

relationships, the DeShaney Court suggested, but never expressly recognized, the possibility that liability might arise where the state creates or substantially contributes to the creation of a danger." Id.[9] Regardless of whether a plaintiff proceeds under the theory that the defendants are liable because they limited his ability to protect himself (the "limitation" theory), or under the theory that they are liable because they created or substantially contributed to the danger he faced and then failed to protect him from it (the "state-created danger" theory), the defendants' actions must also "shock the conscience of the court," Rivera, 402 F.3d at 35, in order for the plaintiff to prevail. See Lockhart-Bembery v. Sauro, 498 F.3d 69, 77 (1st Cir. 2007) (applying "shock the conscience" standard to a state-created danger claim); J.R. v.

---

[9] This circuit has expressed uncertainty about whether these exceptions constitute two separate exceptions or just one. Vélez-Díaz noted that "'it is not clear from the "creation of danger" language in DeShaney whether a state action which enhances or creates danger to an individual would provide a separate exception to the general rule of no duty to protect, or whether the language is simply in service of the special relationship exception and provides a set of circumstances where the state's actions might create a "special relationship" and thus a duty to protect.'" Vélez-Díaz, 421 F.3d at 80 n.3 (quoting Rivera, 402 F.3d at 35 n.5). Recently, however, this court suggested that (1) the "state-created danger" theory and (2) what might be termed the "limitation" theory (i.e., that if the state limits an individual's ability to protect himself, it may be held liable for harm caused by a third party) are two separate exceptions to the general rule that the state's failure to protect does not constitute a due process violation. See J.R. v. Gloria, 593 F.3d 73, 79 & n.3 (1st Cir. 2010).

-18-

<u>Gloria</u>, 593 F.3d 73, 79 (1st Cir. 2010) (applying same standard in discussing a "limitation" theory claim).

Even if Meléndez were able to establish that the officials here (1) either (a) created a danger and then failed to protect him from it or (b) limited his ability to protect himself or receive protection from outside sources, and (2) engaged in conscience-shocking conduct, he would still need to prove that it would have been clear to a reasonable UPR official that the relevant behavior here was unlawful. He cannot do so.

In order to "shock the contemporary conscience," state action must be "egregious" and "outrageous." <u>Rivera</u>, 402 F.3d at 36 (quoting <u>County of Sacramento</u> v. <u>Lewis</u>, 523 U.S. 833, 847 n.8 (1998)). "In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" <u>Id.</u> (citing <u>County of Sacramento</u>, 523 U.S. at 851-52). "'[D]eliberate indifference,'" however, "'that shocks in one environment may not be so patently egregious in another.'" <u>Ramos-Piñero</u> v. <u>Puerto Rico</u>, 453 F.3d 48, 53 (1st Cir. 2006) (quoting <u>County of Sacramento</u>, 523 U.S. at 850). "The burden to show state conduct that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law, even violations resulting from bad faith' to 'something more egregious and more extreme.'"

<u>J.R.</u>, 593 F.3d at 80 (quoting <u>DePoutot</u> v. <u>Raffaelly</u>, 424 F.3d 112, 119 (1st Cir. 2005)).

Meléndez argues that the university has been deliberately indifferent to the ROTC's security needs and that this alleged deliberate indifference shocks the conscience. He does not attempt to explain why he believes the relevant law was "clearly established." We conclude that it would not have been clear to a reasonable official that the conduct about which Meléndez complains was unlawful.

The district court concluded that the continued implementation of the NCP was not conscience-shocking because it was "an attempt, however imperfect, to balance the competing rights of free speech, safety and use of university property by different student groups on campus." <u>Meléndez I</u>, slip op. at 23. In light of the evidence that the NCP was established to balance these rights and goals, we conclude that it would not have been clear to a reasonable official that continuing to implement the NCP was unlawful. Meléndez argues, however, that other acts of alleged deliberate indifference substantially increased the risk of harm to ROTC members. These acts, according to Meléndez, included failure to (1) punish those who harassed ROTC members, (2) take a public stand about the rights of ROTC members, and (3) train the Campus Guard to protect ROTC members. Even all of these omissions, taken together, are not so egregious as to make it clear to a reasonable

official that such conduct would constitute a violation of the due process clause.

Furthermore, we have recognized that "[e]ven where the government is aware of specific dangers . . . it must perform a triage among competing demands." Ramos-Piñero, 453 F.3d at 54. Although some of the omissions that Meléndez alleges contributed to the dangerous atmosphere at UPR-RP might have been relatively easy to remedy (e.g., not taking a public stand about the rights of ROTC members), others may have been more expensive or time-consuming to address (e.g., not training the Campus Guard to protect ROTC members during protests) or involved trade-offs (e.g., not calling in PRPD officers, given that allowing the officers to enter might have led to increased violence). Because a university, like a local government, must choose how to use limited resources, it would not have been clear to a reasonable official that the choices that were made here violated the plaintiff's right to substantive due process.

For all these reasons, we affirm the grant of qualified immunity on the due process claim.[10]

---

[10] Meléndez also claims that the district court erred procedurally when it failed to credit his evidence regarding "numerous acts of violence, shootings and murder against the ROTC" over the last forty years. It appears, however, that the district court did consider this evidence. The district court mentioned that an ROTC cadet was killed after a protest in 1971. See Meléndez I, slip op. at 9. It also noted that "problems for the ROTC program continued" in the 1980s, citing the 1984 discovery of a bomb at the ROTC facility. Id. at 10. In addition, the district court noted a

## 2. The Equal Protection Claim

Meléndez claims that the district court improperly applied equal protection jurisprudence in concluding that there was no evidence that the defendants intentionally discriminated against ROTC members. Again, we review the lower court's qualified immunity determination de novo. Walden, 596 F.3d at 52. We conclude that the defendants were entitled to qualified immunity because there was insufficient evidence to establish that they violated Meléndez's right to equal protection.

It is true that "[t]he [s]tate may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." DeShaney, 489 U.S. at 197 n.3; see also Hayden v. Grayson, 134 F.3d 449, 452 (1st Cir. 1998). In order to prevail on an equal protection claim based upon alleged selective denial of protection, "plaintiffs must adduce competent evidence of 'purposeful discrimination.'" Hayden, 134 F.3d at 453 (quoting Washington v. Davis, 426 U.S. 229, 244 (1976)). A plaintiff must show that "'the decisionmaker . . . selected or reaffirmed a course of action at least in part

---

number of more recent incidents of harassment. See id. at 11-12. Finally, the court phrased one of the relevant questions as whether "continued application of the NCP to the ROTC program amounted to such a deliberate indifference to the safety of ROTC officers and cadets so as to shock the conscience of the court," "given the history of violence and threats against the ROTC program." Id. at 22 (emphasis added). Because it is clear that the district court considered this evidence, we reject the plaintiff's argument.

'because of,' not merely 'in spite of[,]' its adverse effects upon an identifiable group.'" Soto v. Flores, 103 F.3d 1056, 1067 (1st Cir. 1997) (quoting Pers. Adm'r v. Feeney, 442 U.S. 256, 279 (1979)) (applying standard in context of allegedly discriminatory treatment of complaints regarding domestic violence against women).

There is no evidence that the NCP is discriminatory on its face or has been applied in a discriminatory manner. The policy has never, either in its written or unwritten form, applied specifically to ROTC-related protests. There is no evidence that, in the years since the inception of the NCP, the UPR administration has ever asked the PRPD for assistance during a protest, either related to ROTC or not. Where failure to act is the result of a "neutral nonintervention policy," it cannot form the basis of an equal protection claim. Hayden, 134 F.3d at 454.

Furthermore, there is not sufficient evidence that the other alleged omissions that might potentially constitute denials of equal protection -- the Campus Guard's failure to chase culprits and perform civil arrests, the university's failure to investigate the assault and identify additional culprits, and the failure to punish the convicted culprit with something more severe than a simple reprimand -- were the result of discriminatory animus. Indeed, the deposition of Samuel Molina, one of the members of the Campus Guard present when Meléndez was attacked, suggests that Molina failed to execute arrests because his priority during the

-23-

attack was to get people off of Meléndez, and after the attack, he could not reach the culprits. Guard Director Artemio De Jesús explained during his deposition that the culprits were not arrested in part because the Campus Guard officers were focused on preventing an even larger confrontation, protecting Meléndez and Pizarro from continuing attack, and providing medical assistance to them.[11] Former Associate Dean Jimmy Torres Rodríguez also explained that neither he, nor former Dean Carlos C. Ramos Bellido, nor former Chancellor Hillyer proposed disciplining any of the students involved in the Meléndez attack because the victims "didn't want to file any complaint [and] said they wanted to file complaints at the . . . federal level."[12]

---

[11] De Jesús also said during his deposition that the Campus Guard did not make any arrests because the victims did not ask them to do so. Although this explanation alone might seem illogical and pretextual given that a member of the Campus Guard can arrest any person whom he sees committing a felony or any person he believes, based on probable cause, has committed a felony, this deposition testimony, in combination with the rest of the evidence, does not suggest discriminatory intent.

[12] Meléndez cites additional facts as evidence of discriminatory intent. First, he claims that the 1970 Special Report of the Puerto Rico Civil Rights Commission is clear evidence of a "historic discriminatory policy of unequal law enforcement." Although that report documents various acts of violence against ROTC members and recommends that the university take certain actions to avoid violent protests and sanction those who engage in them, it does not include evidence that university officials failed to protect ROTC staff and cadets because of their ROTC affiliations.

Second, Meléndez cites Hillyer's statement, recounted in Brig. Col. Armbrister's deposition, that he did not "personally support" the ROTC program. Meléndez, however, neglects to mention that,

-24-

In light of these facts, we conclude that Meléndez has failed to demonstrate that the defendants acted with discriminatory intent. Accordingly, Meléndez's right to equal protection was not violated, and the defendants are entitled to qualified immunity on the equal protection claim.

### 3. The Uniformed Services Employment and Reemployment Rights Act ("USERRA") Claim

Meléndez argued below that he could bring a section 1983 claim predicated on a violation of the USERRA, 38 U.S.C. §§ 4301-4335, which prohibits employment discrimination against individuals based upon their service in the uniformed services. Specifically, he claimed that the defendants' failure to provide protection against attacks by ROTC opponents constituted a denial of a "benefit of employment by an employer" based upon his membership in the armed forces. 38 U.S.C. § 4311(a). The district court noted that it was not "clear whether the individual Defendants could

according to Armbrister, Hillyer said that he would support the ROTC program in his official capacity.

Third, Meléndez claims that ROTC officers requested that the university issue a clear statement about the ROTC's right to be a part of the university, and that the university failed to make any such pronouncement. We cannot infer, from the fact that the university decided not to issue this statement, that administrators chose their course of action "'because of,' and not merely 'in spite of[,]' its adverse effects upon" ROTC staff and cadets. Soto, 103 F.3d at 1067 (quoting Feeney, 442 U.S. at 279). Rather, it appears from Bellido's deposition testimony that the school declined to issue a written statement regarding the ROTC's right to be on campus, and instead chose to meet with ROTC members off campus, because administrators were "trying to avoid conflict on campus."

-25-

properly be considered 'employers' as defined by the statute," Meléndez I, slip op. at 28 n.25, but, rather than dismissing the plaintiff's argument on that ground, dismissed it based upon its conclusion that Congress "implicitly precluded enforcement of [USERRA] violations through § 1983," id. at 31. Meléndez now argues that the district court's conclusion that the USERRA was not enforceable through a section 1983 claim was in error. We review this challenge to the district court's order de novo both because the district court resolved the matter on summary judgment and because this is an issue of law. See Bristol West Ins. Co. v. Wawanesa Mut. Ins. Co., 570 F.3d 461, 463 (1st Cir. 2009).

We need not reach the issue of whether Congress intended to prohibit plaintiffs from bringing section 1983 claims predicated on USERRA violations because the statutory language of the USERRA does not appear to protect against the types of violations that Meléndez alleges occurred. Meléndez provides no support for his proposition that being protected from assault by ROTC opponents is a "benefit of employment." The USERRA defines "benefit of employment" as "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice" and then enumerates various benefits. 38 U.S.C. § 4303(2). Courts have concluded that "benefits of employment" include not being assigned

to a position with "drastically different" job responsibilities, Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 306 n.4 (4th Cir. 2006); having a "more regular working schedule," Hill v. Michelin N. Am., Inc., 252 F.3d 307, 313 (4th Cir. 2001); and having the opportunity to take, within a reasonable period of time, an exam required for a promotion or other advantage, see Domínguez v. Miami-Dade County, 669 F. Supp. 2d 1340, 1347 (S.D. Fla. 2009). Here, Meléndez does not argue that his right to be protected by the defendants against on-campus assaults arose from any employment relationship; rather, he maintains that he should have been protected against assault in the same manner that any other person, whether employed by UPR or not, would have been protected against assault. Because Meléndez was not deprived of any "benefit of employment" within the meaning of the USERRA, he cannot predicate his section 1983 claim on a USERRA violation.

## C.  The Jurisdictional Issue

Meléndez argued below that the district court had subject matter jurisdiction over his state-law claims even after it dismissed his federal claims because he was domiciled in Texas when he filed his complaint, in April 2002, and thus there was diversity of citizenship between him and the defendants.  When the district court dismissed Meléndez's federal-law claims in its 2007 order, it requested that Meléndez provide evidence that he was domiciled in Texas at the time he filed his complaint.  See Meléndez I, slip

-27-

op. at 32.  After holding an evidentiary hearing on the existence of diversity jurisdiction and considering all the relevant submissions, the district court concluded that it did not have jurisdiction over the state-law claims and dismissed them.

When a defendant challenges the court's jurisdiction based on lack of diversity, "'the party invoking subject matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction.'" Padilla-Manqual v. Pavía Hosp., 516 F.3d 29, 31 (1st Cir. 2008) (quoting Bank One, Tex., N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992)).  A district court's determination that an individual has "failed to meet his burden of proving that he changed his domicile . . . at the time he filed his federal complaint is a mixed question of law and fact and as such may not be set aside unless clearly erroneous."  Id. at 32 (internal quotation marks omitted).  "'A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.'"  Id. (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)).  We conclude that the district court's determination that Meléndez was domiciled in Puerto Rico in April 2002 was not clearly erroneous.

"A person's domicile is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning."  Id. at 31 (internal

-28-

quotation marks omitted).  "Domicile is determined as of the time the suit is filed."  Id.  "There is, ordinarily, a presumption of continuing domicile."  Id.  In order to show change of domicile, a party must establish that he (1) was "present in the new domicile" and (2) "intend[ed] to remain there."  Bank One, 964 F.2d at 50.  Another specific presumption applies to members of the military:  "Service personnel are presumed not to acquire a new domicile when they are stationed in a place pursuant to orders; they retain the domicile they had at the time of entry into the services."  13E Charles Alan Wright et al., Federal Practice and Procedure § 3617, at 607 (3d ed. 2009); see also Chico v. P.R. Elec. Power Auth., 312 F. Supp. 2d 153, 158 (D.P.R. 2004); Rosado-Marrero v. Hosp. San Pablo, Inc., 927 F. Supp. 576, 577 (D.P.R. 1996); Codagnone v. Perrin, 351 F. Supp. 1126, 1129 (D.R.I. 1972).  A service member may, however, rebut this presumption by "demonstrat[ing] that despite his involuntary presence in a state, he or she has formed the intention to make a home in that state."  13E Wright et al., supra, § 3617, at 608-09.  Such proof "requires clear and unequivocal evidence."  Id. at 609; see also Chico, 312 F. Supp. 2d at 158; Rosado-Marrero, 927 F. Supp. at 577; Codagnone, 351 F. Supp. at 1129.

The following factors are relevant in determining whether a party intends to make his home in a given state:  "'the place where civil and political rights are exercised, taxes paid, real

-29-

and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment.'" Padilla-Manqual, 516 F.3d at 32 (quoting Bank One, 964 F.2d at 50). "While no single factor is controlling, some courts have presumed domicile in a state is established where a party is registered to vote." Id. This circuit, however, "has not recognized such a presumption," though it has "said that the place a person is registered to vote is a 'weighty' factor in determining domicile." Id. (quoting Lundquist v. Precision Valley Aviation, Inc., 946 F.2d 8, 12 (1st Cir. 1991)).

Here, Meléndez argues that he became a Texas domiciliary at some point between 1989, when he was first assigned to Fort Bliss in El Paso, Texas, and 1998, when he returned to Puerto Rico to serve in the ROTC program.[13] He marshals the following evidence to support his argument: (1) he lived in Texas on and off for six years, beginning in 1984 and ending in 1998; (2) his former wife, whom he married in 1991, was originally from El Paso, Texas, and his oldest son was born in Texas;[14] (3) between 1996 and 1998, he

---

[13] In the evidentiary hearing on the jurisdiction issue, Meléndez testified that he "was a resident from Texas in 1989, officially." Much of the evidence to support his Texas domicile, however, relates to activities in the years after 1989. Thus, his theory of domicile appears to be that he became a domiciliary at some point before 1998, but not necessarily in 1989.

[14] Meléndez's younger son was born in Panama, where Meléndez was temporarily stationed.

-30-

lived in Texas with his then wife and two children, both on the base and in private housing outside the base;[15] (4) he opened a bank account in San Antonio, Texas, in 1984, which has always been his principal bank account; (5) he obtained a Texas driver's license in between 1989 and 1991;[16] (6) he voted in the 1992 and 1996 elections while living in Texas, and has not voted in an election in Puerto Rico since 1980; and (7) he paid Texas state sales taxes.[17]

Even assuming that these facts constitute the requisite "clear and unequivocal" evidence of intent to "make a home" in Texas as of 1998, the district court did not clearly err in concluding that Meléndez was not a Texas domiciliary as of April 2002, given the countervailing deposition testimony suggesting that he decided, at some point between 1998 and 2002, to remain in Puerto Rico. The following colloquy took place during Meléndez's April 12, 2005 deposition:

> Q. Then, as a result of your new job, you were forced to leave Puerto Rico and go with the rest of the U.S. South Army to their new offices in Texas?
> A. [That is correct.]

---

[15] During Meléndez's ROTC assignment, he lived with his family in rented housing.

[16] Meléndez also obtained a Puerto Rico driver's license at some point between 1989 and 1991.

[17] Meléndez did not pay state income taxes in Texas because the state does not collect income taxes. Meléndez did not, however, file Puerto Rico income tax returns between 1998 and 2003, either.

           Q.   So if this incident had not happened,
                is it fair to say that you would have
                remained in the ROTC . . .
           A.   I would have retired here, and I would
                have remained in the ROTC.
           Q.   And you would have stayed living in
                Puerto Rico?
           A.   Living in Puerto Rico, yes.
           Q.   But, as a result of the incident, you
                had to find a new job, which eventually
                took you away from Puerto Rico?
           A.   [That is so.]

Shortly afterward, Meléndez reiterated that he would have stayed in

Puerto Rico for a longer period of time if not for the assault:

           Q.   How does it make you feel that your
                plans of retiring as an ROTC instructor
                never happened because of the incident
                of April thirty two thousand and one?
           A.   It affects me a lot.  My plans were to
                stay in Puerto Rico with my family, my
                father, my mother, my uncles.  Now I am
                working in a place where I am alone.  I
                don't have any Puerto Ricans.  There's
                just a handful. . . .  I am working at
                a job that I had to . . .  Because I
                can't just sit around doing nothing, I
                have to work. . . .  Everything is just
                fine, but I'm still far from my island.
           Q.   Does it affect you emotionally?
           A.   Oh yes.  That is frustrating.  One of
                my goals that I was unable to realize.

The parties disagreed about whether Meléndez's statement that he

intended to "retire" in Puerto Rico meant only that he intended to

complete his military career in Puerto Rico, or that he intended to

live in Puerto Rico after the end of his military service.  The

district court, however, concluded that even if it assumed that

Meléndez's statement that he wished to "retire" in Puerto Rico

meant only that he intended to end his military career there, his

statement that his "plans were to stay in Puerto Rico with [his] family, [his] mother, [his] uncles" was "an unequivocal expression of the fact that, at some point prior to April 30, 2002, plaintiff had formed the intention to remain in Puerto Rico." Meléndez III, slip op. at 9. We agree. Even assuming that Meléndez became a Texas domiciliary at some point before 1998, he did not remain a Texas domiciliary through 2002; rather, he decided, at some point between 1998 and 2002, to remain in Puerto Rico, where he was then living. At that point, he became a Puerto Rico domiciliary. See Bank One, 964 F.2d at 50 (presence in state and intent to remain in state necessary to show domicile). The fact that Meléndez identified himself as a citizen of Bayamón, Puerto Rico, in a state court complaint filed simultaneously with his federal court complaint, and failed to explain this discrepancy, see Meléndez III, slip op. at 13, also supports the conclusion that he was a domiciliary of Puerto Rico in April 2002. Finally, Meléndez's evidence that he authorized his former wife to purchase a home in Texas, and that she bought a house there at some point during 2002,[18] is not sufficient to establish, in the face of the evidence

---

[18] There is substantial uncertainty about when Meléndez's ex-wife purchased the relevant house. In a declaration admitted into evidence by the district court, Meléndez stated that his wife bought a house in 2002 in Texas, and that, by April 2002, he "considered this house . . . [his] home to which [he] returned to in order to be with [his] children and spouse." At his evidentiary hearing, however, when asked in what month he bought the home, he responded, "I need to research that one, exactly, I don't remember exactly the date." When asked whether, "[a]ccording to [his] best

-33-

to the contrary, that between 1998 and April 2002, Meléndez continued to intend to return to Texas, rather than to remain in Puerto Rico.  Thus, we conclude that the district court did not clearly err when it concluded that Meléndez was a Puerto Rico domiciliary on April 30, 2002.

### III.  Conclusion

For the reasons stated, we affirm all of the challenged district court orders.

**Affirmed**.

---

recollection," he bought "the house near the end of the year 2002, or at [the] beginning of the year," he responded, "I say again, if my recollection [is correct,] I think it was at the first of the year 2002 [sic].  Close to the first months of the year, I need to verify that, we are talking about a long time ago."