**Glenn C. ELLIS, Jr., Plaintiff,**

v.

**SOUTHEAST CONSTRUCTION COMPANY, Hempstead County, Arkansas and Miller M. Bland, Defendants.**

**Civ. A. No. 648.**

United States District Court
W. D. Arkansas,
Texarkana Division.
Jan. 20, 1958.

Shaver, Tackett & Jones, Boyd Tackett, Texarkana, Ark., for plaintiff.

Weisenberger & Wilson, Royce Weisenberger, Hope, Ark., for defendants Hempstead County, Ark., and Miller M. Bland.

Wright, Harrison, Lindsey & Upton, Alston Jennings, and Robert Shults, Little Rock, Ark., for Southeast Const. Co.

LEMLEY, Chief Judge.

This cause, which is an action for damages to real estate located in Hempstead County, Arkansas, is now before the Court upon the jurisdictional question of

whether or not there is diversity of citizenship between the parties, which question has been submitted upon oral testimony and memorandum pre-hearing briefs. The plaintiff, Glenn C. Ellis, Jr., a native of Arkansas, who is now a technical sergeant in the United States Air Force, stationed at Barksdale Field, Shreveport, Louisiana, claims that in the course of his military service he has abandoned his original domicile in Arkansas, and has acquired a domicile of choice in Louisiana, and is a citizen of that state. The defendants, Southeast Construction Co., an Arkansas corporation, Hempstead County, Arkansas, a political subdivision of the State of Arkansas, and Miller M. Bland, an individual Arkansas citizen, contend, on the other hand, that the plaintiff is still a citizen of Arkansas, and that there is an absence of diversity.[1] In the course of the hearing the following background facts were developed:

The plaintiff, who is thirty-eight years of age, was born and raised in Saratoga, Arkansas, and enlisted in the armed forces on April 26, 1939. He has been continuously in the service since that time, and has been stationed at various places in this country, and has also served abroad; his duties in the Air Force are those of a flight engineer, and he earns a gross salary of slightly more than $500 per month.

In 1941 he married a Nashville, Arkansas girl, and they now have three children, one a boy about twelve years old, a girl nearly seven years of age, and an infant daughter who at the time of the hearing was only about two weeks old. In the course of the marriage Mrs. Ellis and the older children have lived with the plaintiff whenever he has had what he calls a "permanent station", by which term he explained that he means a station to which his family may be brought at government expense and where he may reasonably expect to remain for a material period of time. Prior to his transfer to Barksdale Field he has had "permanent stations" at Tampa, Florida, where he remained for nearly seven years, Rapid City, South Dakota, where he remained for two and one-half years, and Salina, Kansas, where he was stationed for less than one year. While stationed at Tampa, plaintiff bought a house for his family because he was dissatisfied with available government housing and because his prospects of remaining there attached to the Strategic Air Command appeared to be good, he kept the house about two years, and, upon his transfer to South Dakota, sold it, or his equity therein.

The plaintiff was transferred to Barksdale Field in March, 1956 and until August 26, 1957 he and his family lived in a rented apartment, paying $75 per month rent plus $15 per month for utilities. On the date last mentioned he purchased a house on the installment plan; the total purchase price of the house was $15,500, of which sum he paid $800 down, plus certain "closing costs," and executed an installment note and mortgage for the balance of $14,700, which note called for monthly payments of $81.29 each over a thirty year period. The house was purchased after the acts of which the plaintiff complains allegedly took place and after this suit was filed.

1. In his complaint the plaintiff alleged himself to be the owner of the fee simple title to the land here involved; it developed later on, however, that his grandmother, Mrs. Emma E. Bland, an admitted citizen of Arkansas, holds a life estate in said lands, and she has filed a motion for leave to intervene as a party plaintiff herein, attaching to her motion a proposed complaint in intervention, her theory being that her proposed intervention is ancillary to the claim asserted by the plaintiff. Unless the proposed intervention is ancillary, it is obvious that to bring Mrs. Bland into the case would destroy diversity and oust the court of jurisdiction; on the other hand, if, as the defendants contend, she is an indispensable party, this court cannot proceed without her. The view that we take of the plaintiff's citizenship, however, renders it unnecessary for us to pass upon her motion for leave to intervene, or to determine whether or not she is an indispensable party.

According to the complaint and the proposed complaint in intervention, which pleadings were prepared by the attorney who represents both the plaintiff and his grandmother, the land here involved was acquired by the plaintiff in 1949 by means of a warranty deed executed by a number of his relatives. In the same month in which that deed was executed he and his grandmother entered into a contract which recited that he had paid a cash consideration of $1,350 for the property; said contract gave a life estate in the land to the grandparents of the plaintiff, permitted them to enjoy the income from the land during the life estate, and obligated them to keep the taxes paid and to discharge a prior existing indebtedness against the property. The contract also provided that the plaintiff could make such improvements as he might desire on the property during the life estate.

The only evidence introduced at the hearing was the testimony of the plaintiff and his wife, and certified copies of the deed, note and mortgage covering the Shreveport property. Before discussing the controversial portions of this testimony and the jurisdictional question before us, we deem it well to set forth certain general legal principles which are applicable to cases of this kind:

For purposes of federal jurisdiction, "domicile" and "citizenship" are synonymous terms, 54 Am.Jur. "United States Courts," Section 58, p. 711; 1 Barron & Holtzoff, "Federal Practice & Procedure," Section 26, p. 55; Delaware L. & W. R. Co. v. Petrowsky, 2 Cir., 250 F. 554; Bjornquist v. Boston & A. R. Co., 1 Cir., 250 F. 929, 5 A.L.R. 951; Valentine v. Powers, D.C.Neb., 85 F.Supp. 732; Taylor v. Milam, D.C.Ark., 89 F.Supp. 880. A person can have only one domicile at a time, and a domicile once obtained persists until a new one is acquired. Desmare v. United States, 93 U.S. 605, 23 L.Ed. 959; Mitchell v. United States, 21 Wall. 350, 88 U.S. 350, 22 L. Ed. 584; Berger v. Berger, 3 Cir., 210 F.2d 403; Sivalls v. United States, 5 Cir., 205 F.2d 444; Barber v. Varleta, 9 Cir.,

199 F.2d 419; Mid-Continent Pipe Line Co. v. Whitely, 10 Cir., 116 F.2d 871; Taylor v. Milam, supra, D.C.Ark., 89 F. Supp. 880.

Any person who is sui juris has a right to change his domicile, and such change is accomplished when there is a concurrence of the physical presence of a person at the place of the domicile claimed and of an honest intention on his part to make such place his present home. 28 C.J.S. Domicile § 12, p. 20; Spurgeon v. Mission State Bank, 8 Cir., 151 F.2d 702; Maple Island Farm v. Bitterling, 8 Cir., 196 F.2d 55. "If a person capable of making his choice honestly regards a place as his present home, the motive prompting him is immaterial." Spurgeon v. Mission State Bank, supra, 151 F.2d at page 706. But a mere intent to make a new home at a given place in the future or upon the happening of some contingency is insufficient. 28 C.J.S. Domicile, § 11, p. 20. One of the marked evidences of domicile is that "the person claiming it identifies himself and all his interests with his new place of abode, and exercises the right and performs the duties of a citizen." Byers v. United States, 141 F.Supp. 927, 929, 136 Ct.Cl. 250, quoting with approval from Thompson v. Warner, 83 Md. 14, 34 A. 830, 831. Among the circumstances usually relied upon to establish the requisite intent are: " 'Declarations of the party; the exercise of political rights; the payment of personal taxes; a house of residence, and a place of business.' " Ibid, quoting from Mitchell v. United States, supra, 88 U.S. at page 353.

The question of domicile is a mixed one of law and fact, with the factual elements predominating. Maple Island Farm v. Bitterling, supra, 8 Cir., 196 F.2d at page 59. There is a presumption in favor of an original or former domicile as against an acquired one; proof of a change of domicile must be clear and convincing, and more evidence is required to show a loss of a domicile of origin than of any other kind. Ibid.; see also 28 C.J.S. Domicile § 18a.

Since the acquisition of a domicile of choice involves the exercise of free will, and since members of the armed services are persons under authority, going where they are sent and abiding in a locality only for so long as their superiors permit them to remain, enlistment in one of such services does not ordinarily destroy a domicile of origin, nor in general does a serviceman acquire a new domicile in a state in which he may be stationed. A new domicile may be acquired by such a person, however, "if the circumstances show an intent on his part to abandon the old domicile and adopt the new one." 17A Am.Jur. "Domicil", Section 40, p. 227; see also 28 C.J.S. Domicile § 12(g), p. 28. As in other cases in which change of domicile is relied upon, the evidence establishing such change must be clear and convincing. Kinsel v. Pickens, D.C.Tex., 25 F.Supp. 455.

From our consideration of the cases in which the courts have been concerned with whether or not service personnel have acquired domiciles of choice at places where stationed, it appears to us that the courts in passing upon such question have considered not only the declarations and testimony of the persons involved, but also their actual military or naval status, the presence or absence of ties with the original or former domicile which would indicate its retention, and whether or not the person involved has formed such ties or connections with the new location as would indicate that he considers it to be his true home. Ex parte White, D.C.N.H., 228 F. 88; Sealey v. United States, D.C.Va., 7 F.Supp. 434; Kinsel v. Pickens, supra, D.C.Tex., 25 F. Supp. 455; Wise v. Bolster, D.C.Wash., 31 F.Supp. 856; Humphrey v. Ft. Knox Transit Co., D.C.Ky., 58 F.Supp. 362, affirmed per curiam, 6 Cir., 151 F.2d 602; Von Knorr v. Miles, D.C.Mass., 60 F. Supp. 962, reversed on other grounds, 1 Cir., 156 F.2d 287; Seegers v. Strzempek, D.C.Mich., 149 F.Supp. 35; Mangene v. Diamond, 9 Cir., 229 F.2d 554;

Kennedy v. Kennedy, 205 Ark. 650, 169 S.W.2d 876; Mohr v. Mohr, 206 Ark. 1094, 178 S.W.2d 502; Buck v. Buck, 207 Ark. 1067, 184 S.W.2d 68.[2] And it is always important to keep in mind that domicile is largely a matter of intent, and that acts and conduct, or the absence thereof, frequently give a truer indication of such than declarations or testimony made or given after the controversy has arisen and the party has become aware of the significance of his intent.

When the original jurisdiction of a federal court is invoked on the basis of alleged diversity of citizenship, the existence of such diversity must be determined with reference to the date upon which the suit was filed, here June 26, 1957. 54 Am.Jur. "United States Courts," Section 59 and cases there cited. Hence, the controlling question in this case is whether or not on that date the plaintiff had abandoned his original Arkansas domicile and honestly regarded Louisiana as his home. When the testimony in the case is examined in the light of the principles above stated, we feel that it falls short of the clear and convincing proof which the plaintiff was required to produce to show the change of citizenship upon which he relies, from which it follows that the complaint must be dismissed for lack of jurisdiction.

While it is true that the plaintiff testified that he has not declared Arkansas as his home since 1945, that he considers Shreveport to be his home, and that he intends to reside there permanently, it must be borne in mind that he is an interested party, and his testimony cannot be considered as entirely uncontradicted. Moreover, his testimony is seriously impeached by a statement that he made when his discovery deposition was taken in September, 1957. In that connection, the plaintiff testified at the hearing that he plans to retire from the armed forces at the conclusion of 20 years' service, which will be in 1959, and that he formed such intention two and one-half years

2. For other state court cases see annotation in 129 A.L.R. at page 1383ff, and additional annotations cited in 17A Am. Jur. "Domicil," Section 40, p 228, footnote 20. Cf. Woodroffe v. Village of Park Forest, D.C.Ill., 107 F.Supp. 906, and Byers v. United States, supra, 141 F.Supp. 927, 136 Ct.Cl. 250.

ago. The importance of that testimony as bearing upon his domiciliary intent and attitude toward his present location is obvious.[3] On cross-examination, however, he was confronted with his prior deposition in the course of which he was asked specifically and directly whether or not he intended to retire upon the completion of 20 years' service, to which question he replied that he had no fixed intention in that regard one way or the other. Plaintiff attempted to explain this discrepancy by saying that the question put to him on the deposition was leading, but such was certainly not the case, and his answer was unambiguous.

The plaintiff also testified that it was not the policy of the Air Force to transfer an enlisted man of more than 18 years service against his will but he conceded that he is in fact subject to transfer at the will of his superiors and that since he has been stationed at Barksdale he has been on duty outside the Continental United States for periods totalling about 4½ months. One of these tours of duty of about two months duration took place in the early summer of 1956 and while he was away his wife and the two older children visited her relatives in Saratoga. He also testified that Barksdale Field was the station of his choice and that he had gone to considerable trouble, including correspondence with the Arkansas Senators and Representatives in Congress, to be assigned there but he also testified that the condition of his father and grandmother, who resided at Saratoga, and that of his wife's father, who was then living at Nashville, Arkansas and was then seriously ill with heart trouble, played a part in his choosing Barksdale Field as a station of duty. None of his correspondence with the Arkansas Representatives in Congress was offered in evidence.

As stated, the plaintiff's wife also testified at the hearing. Her testimony was to the effect that she considers Shreveport to be her home, that she wants her children to be permanently located for school purposes, and that regardless of where or for how long her husband may be transferred, she has no intention of leaving Shreveport. But she is also an interested witness, and, more than that, her testimony related to her own intentions and feelings rather than to those of her husband, and her intent is not of controlling importance here.

Furthermore, it is plain from the testimony of both the plaintiff and his wife that they still have strong ties and connections with Arkansas. While Mrs. Ellis' father is now dead, she has four sisters living at Saratoga; the plaintiff's father and grandmother live in the old home at Saratoga, and he also has an uncle, aunt, and three first cousins living there, which relatives are visited by him and his wife. Some time back the plaintiff and his brother, who is also in the service, noted that the house at Saratoga was in a run-down condition, and they agreed to pay off an F.H.A. loan to make repairs thereto, and they now hold a second mortgage on the house. Further, the plaintiff owns the rural property involved in this case, which he acquired in 1949 as above indicated, and while he testified that he has no intention of ever coming back to this farm, it will be remembered that in the contract between him and his grandparents he reserved the right to make such improvements on the property as he might desire during the continuance of the life estate. In addition, we think it noteworthy that in his efforts to be assigned to Barksdale Field the senators and congressmen with whom he corresponded were those from Arkansas; there is no showing that he contacted representatives from any other state.

Not only does it appear that the plaintiff has preserved substantial ties with Arkansas, but, apart from the matter of the house, which will be presently discussed, there is a significant absence of evidence that he has formed any connections with Louisiana which would indicate that he considers himself "at home" there. Although he has been stationed at Barksdale Field since March, 1956, he admits that he has never voted in Louisi-

3. See Von Knorr v. Miles, supra, D.C. Mass., 60 F.Supp. 962.

ana or registered there for voting purposes, and there is no showing that he has ever assessed any personal property there for taxation, or that either he or his wife has formed any social, religious or fraternal ties in Shreveport tending to show that they consider themselves a part of that community or assimilated to its life.

As to the purchase of the house, we do not think it unusual for commissioned officers or enlisted men of the plaintiff's rank and status, when they are stationed at a place for a substantial period of time, to purchase houses as "another way of paying rent," and we do not think that such purchases necessarily indicate a change of domicile. The serviceman makes a small down payment on the house, makes monthly payments on the balance of the purchase price, which are usually roughly equivalent to the rent that he would otherwise pay, and upon transfer he sells his equity. Even if he fails to get back his full equity, he is still usually the gainer since had he simply continued to live as a tenant, he would have built up no equity at all.

To our mind the plaintiff, in buying the house, has done no more than what he estimates ten to fifteen percent of married noncommissioned officers of his own rank are accustomed to doing when similarly situated, and what he himself did when he was stationed at Tampa. He has bought a dwelling in a private housing development, making a down payment, exclusive of "closing costs," of about five percent of the total purchase price and agreeing to pay the balance of $14,700 plus 5¼% interest in monthly installments of $81.29, which is only $6.29 per month more than the rent he was formerly paying. He further testified that the house which he bought was larger than his former apartment, and that the rent that he would have to pay in Shreveport for living accommodations equal to his present house would amount to more than he is now paying on his note. It has already been mentioned that the house was not purchased until after the filing of the suit. Although the plaintiff testified that he had made known his intent to buy the house a "considerable time" before the purchase, there is no definite showing as to when this was done or as to the precise nature and contents of the declaration. Of course, it naturally took some time for negotiations to be carried out and financial arrangements to be made. Even if it be assumed, however, that his intent to buy the house was made known prior to the filing of the suit, that would not necessarily mean that such decision had been reached before the instant controversy arose because the complaint alleges that his cause of action is based upon transactions taking place "during the year 1956 or immediately prior thereto." Under the circumstances present here we do not believe that the purchase of the house has any great significance.

In summary, the burden here is upon the plaintiff to establish his alleged change of citizenship by clear and convincing evidence, and in our opinion he has failed to discharge that burden. Let an order of dismissal be entered.