# United States Court of Appeals

### For the Eighth Circuit

_____

No. 16-2021

_____

Aaron D. Eckerberg

*Plaintiff - Appellee*

v.

Inter-State Studio & Publishing Co., also known as Inter-State Studio, Inc.

*Defendant - Appellant*

Karl Persinger

*Defendant*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: February 9, 2017
Filed: June 26, 2017

_____

Before SMITH,[1] GRUENDER, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

Aaron Eckerberg sued Inter-State Studio & Publishing Company ("Inter-State") for damages due to injuries that he sustained when an Inter-State vehicle ran a stop sign and collided with his pickup truck and trailer in Missouri. He brought suit in the Western District of Missouri pursuant to 28 U.S.C. § 1332 as a civil action between citizens of different states. After a five-day trial, the jury awarded him $4.5 million in damages. Inter-State appeals, arguing that (1) the district court[2] lacked subject-matter jurisdiction because both parties were citizens of Missouri, and in the alternative, (2) the district court abused its discretion by not remitting the damages award. We disagree and affirm the judgment of the district court.

## I. *Background*

Eckerberg grew up in Platte City, Missouri. He attended the University of Central Missouri (formerly Central Missouri State University) and joined the United States Marine Corps after graduation. The Marine Corps relocated Eckerberg to Pensacola, Florida, in 1996 for aviation training. While in Florida, he opened a bank account through the Navy Federal Credit Union, registered to vote in Florida, and obtained a Florida driver's license. Under military orders, Eckerberg moved to California in 1998. Shortly after arriving at his new post, he signed a State of Legal Residence Certificate, officially declaring his domicile as Florida. Since that time, Eckerberg has been deployed overseas and assigned to posts in California, Virginia, Kansas, and North Carolina. Eckerberg eventually obtained the rank of Lieutenant Colonel, serving primarily as a helicopter pilot. Through all these transitions, Eckerberg has maintained his bank account, voter registration, tax-filing status, and driver's license in Florida.

In 2006, Eckerberg attended the United States Army Command and General Staff College (CGSC) in Fort Leavenworth, Kansas. For this assignment, he and his

---

[2]The Honorable Matt J. Whitworth, United States Magistrate Judge for the Western District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

wife purchased a home in Platte City, Missouri, where they lived until Eckerberg was reassigned in 2007. The couple continues to own this residence as a rental property. In 2011, Eckerberg was stationed in Virginia but did not change his driver's license, voting records, or domicile declaration from Florida. In November 2013, Eckerberg returned to CGSC for a three-year term as a college instructor. At that time, his family rented a home in Kearney, Missouri, preferring Kearney's public schools to those in Kansas. When he arrived in the state, he transferred title of his two vehicles to Missouri and obtained Missouri licenses for hunting, fishing, and carrying a firearm.

The accident with Inter-State's vehicle occurred just a few months later in February 2014. Eckerberg suffered a compression fracture in his spine and a traumatic brain injury. The accident resulted in $59,000 in direct medical expenses. In July 2014, Eckerberg sued Inter-State in Missouri federal court, alleging diversity jurisdiction as a citizen of Florida against a Missouri corporation with its principal place of business in Missouri. Inter-State admitted liability, but the parties tried Eckerberg's damages claim.

At trial, various medical professionals testified about Eckerberg's injuries. Eckerberg's wife, sister, stepbrother, and a longtime friend testified about the continued physical, emotional, and cognitive effects of the accident. Eckerberg too testified about his injuries and his accident-related memory problems, anxiety, and nightmares. His testimony included descriptions of the continued emotional and psychological effects that his injuries have caused, including effects upon his family:

> [M]y kids now when I walk into a room, they're—it's more inquisitive, like, which dad is showing up today from work? You know, is it happy dad or is it mad dad? So I'm working through that. But it's hard to see that look in your kids' face[s] and think, you know where have I gone wrong? Where did this come from?

-3-

Economist John Ward testified that Eckerberg's potential loss of earnings ranged from $1.3 to $3.3 million because of the accident. The jury returned a verdict of $4.5 million as fair and just compensation "for any damages [they] believe[d] he sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence."

After trial, Inter-State moved to dismiss for lack of subject-matter jurisdiction. The district court held an evidentiary hearing at which both parties presented evidence regarding Eckerberg's domicile. The district court determined that Eckerberg was a domiciliary of Florida for diversity jurisdiction purposes. The court based its determination on Eckerberg's property ownership, voting records, tax forms, and licenses mentioned above. The court also found other factors relevant to the inquiry, including "the Fitness Reports[3] admitted into evidence at the evidentiary hearing, Plaintiff's wife's medical condition, the economic advantages of living in Florida generally, . . . and Plaintiff's own testimony, which included numerous reasons for his intention to return to the state of Florida at the conclusion of his military service." On appeal, Inter-State points to property that Eckerberg purchased after the accident but before filing suit—approximately 40 acres in Clay County, Missouri—to demonstrate Eckerberg's objective intent to make Missouri his

---

[3]A Fitness Report "is the primary means of evaluating a Marine's performance and is the Commandant's primary tool for the selection of personnel for promotion, augmentation, resident schooling, command, and duty assignments." The report includes a description of the Marine's current job duties, the Marine's accomplishments in that position, recommendations for future assignments, and a ranked list of the Marine's top three "Duty Preference" assignments.

-4-

domicile.[4] This property contained an "unlivable" farmhouse, a detached garage, and a pond.

Inter-State also moved for remittitur, which the district court denied. In addition to the economic damages, the district court found that the evidence on Eckerberg's non-economic damages, like "permanent pain, cognitive deficits, strained relationship with wife and children, and loss of life goals including moving up the ranks in the Marines," supported the jury's verdict as fair and reasonable. The court concluded that "[t]he damage award which the jury found can be supported by the evidence and is not shocking, monstrous, or plainly unjust."

## II. *Discussion*

On appeal, Inter-State raises two issues. First, Inter-State asserts that the district court lacked jurisdiction because Eckerberg had become a Missouri domiciliary before filing suit. As evidence of Eckerberg's intent to make Missouri his domicile, Inter-State points to his purchase of the 40-acre development in Missouri and his family and friends' continued physical and emotional support that exists exclusively in Missouri. Second, Inter-State asserts that the $4.5 million damage award was grossly excessive in comparison to the actual medical damages of $59,000. Without attacking the non-economic element of the damage award, Inter-State argues that Eckerberg's continued employability warrants remittitur. As discussed below, we find these arguments unpersuasive.

---

[4]We need not address the parties' arguments regarding judicial notice of the date that Eckerberg purchased the Clay County property. The record includes a loan document for this property issued on June 13, 2014, which was admitted during the evidentiary hearing as Inter-State's Exhibit #52. The Eckerbergs filed an application with the Clay County Planning & Zoning Commission to develop the land as "Eckerberg Estates" in 2015.

A. *Subject-Matter Jurisdiction*

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). The Constitution extends the judicial power of the federal courts to controversies "between Citizens of different States," U.S. Const. art. III, § 2, and Congress enacted legislation to give federal courts "original jurisdiction of all civil actions 'between . . . citizens of different States,'" *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) (ellipsis in original) (quoting 28 U.S.C. § 1332(a)(1)). Such "[d]iversity jurisdiction requires 'complete diversity, that is where no defendant holds citizenship in the same state where any plaintiff holds citizenship.'" *Hubbard v. Federated Mut. Ins. Co.*, 799 F.3d 1224, 1227 (8th Cir. 2015) (quoting *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 445 (8th Cir. 2010)). Subject-matter jurisdiction based on diversity of citizenship must be measured by the "facts that existed at the time of filing." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004). "Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment." *Id.* We review the question of subject-matter jurisdiction de novo, but we rely on the district court's findings of fact underlying its domicile determination unless they are clearly erroneous. *Altimore v. Mount Mercy Coll.*, 420 F.3d 763, 768 (8th Cir. 2005).

Inter-State argues that the district court lacked subject-matter jurisdiction to hear this case because both Inter-State and Eckerberg were citizens of Missouri at the time of filing. "[I]f the jurisdictional allegations are challenged by the defendant, the plaintiff has the burden of establishing jurisdiction by competent proof and by a preponderance of the evidence." *Russell v. New Amsterdam Cas. Co.*, 325 F.2d 996, 998 (8th Cir. 1964). For purposes of jurisdiction, "'[d]omicile' is not necessarily synonymous with 'residence,' and one can reside in one place but be domiciled in another." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (citations omitted). "Service personnel are presumed not to acquire a new domicile

when they are stationed in a place pursuant to orders; they retain the domicile they had at the time of entry into the services," yet this presumption may be rebutted by "clear and unequivocal evidence." *Meléndez–García v. Sánchez*, 629 F.3d 25, 41 (1st Cir. 2010) (quoting 13E Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3617, at 607, 609 (3d ed. 2009)).

> Since the acquisition of a domicile of choice involves the exercise of free will, and since members of the armed services are persons under authority, going where they are sent and abiding in a locality only for so long as their superiors permit them to remain, enlistment in one of such services does not ordinarily destroy a domicile of origin, nor in general does a serviceman acquire a new domicile in a state in which he may be stationed.

*Ellis v. Se. Constr. Co. (Ellis I)*, 158 F. Supp. 798, 802 (W.D. Ark. 1958), *rev'd on other grounds*, 260 F.2d 280 (8th Cir. 1958). "It is presumed that the serviceman has the intention to return to his home, unless the contrary is shown." *Bowman v. DuBose*, 267 F. Supp. 312, 313 (D.S.C. 1967) (quoting *Finger v. Masterson*, 152 F. Supp. 224, 225 (W.D.S.C. 1957)).

"To establish domicile, an individual must both be physically present in the state and have the intent to make his home there indefinitely." *Yeldell v. Tutt*, 913 F.2d 533, 537 (8th Cir. 1990). To determine intent, we rely on objective factors, including "declarations, exercise of civil and political rights, payment of taxes, obtaining of licenses, location of business or occupation, and ownership of property." *Bruton v. Shank*, 349 F.2d 630, 631 n.2 (8th Cir. 1965). A litigant's self-serving "[s]tatements of intention are entitled to little weight when in conflict with facts." *Russell*, 325 F.2d at 999 (quoting *Tudor v. Leslie*, 35 F. Supp. 969, 970 (D. Mass. 1940)). A serviceperson's "unequivocal" statements regarding intent to adopt a new domicile, however, may be used to overcome the presumption against persisting domicile in the home state. *See Meléndez–García*, 629 F.3d at 43 (citing an

"unequivocal expression" as possible evidence to rebut the presumption); *Ellis v. Se. Contr. Co. (Ellis II)*, 260 F.2d 280, 283 (8th Cir. 1958) (relying on the "unequivocal testimony" of the serviceperson).

Eckerberg was a citizen of Missouri when he joined the Marines. *See Miss. Band of Choctaw Indians*, 490 U.S. at 48 ("One acquires a 'domicile of origin' at birth, and that domicile continues until a new one (a 'domicile of choice') is acquired."). At the evidentiary hearing on domicile, Eckerberg presented evidence that upon moving to Florida he registered to vote, opened a bank account, and obtained a driver's license. He also adduced a "State of Legal Residence Certificate" that he signed in 1999 memorializing his intent to claim Florida as his "permanent home and [his] abandonment of the old State of legal residence/domicile." (Emphasis omitted.) Eckerberg also testified about his unequivocal intention to claim Florida as his domicile:

> Q.  When you lived in Florida, did you intend to stop being a resident of Missouri and make Florida your legal residence?
>
> A.  Yes.
>
> Q.  And has that ever changed since that time?
>
> A.  No.
>
> Q.  And at the time that you retire from the Marine Corps, whatever the circumstances, in what state do you intend to reside?
>
> A.  Florida.

The district court determined that Eckerberg established by "clear and unequivocal evidence" his intent to abandon Missouri and claim Florida as his new domicile while he lived there in the late 1990s. The evidence presented at trial adequately supports

this conclusion, and the district court's factual determination was not clearly erroneous. *See Blakemore v. Mo. Pac. R.R. Co.*, 789 F.2d 616, 618 (8th Cir. 1986).

"Once an individual has established his state of citizenship, he remains a citizen of that state until he legally acquires a new state of citizenship." *Altimore*, 420 F.3d at 769. "For purposes of federal jurisdiction, 'domicile' and 'citizenship' are synonymous terms." *Ellis II*, 260 F.2d at 281 (quoting *Ellis I*, 158 F. Supp. at 801). We presume that because Eckerberg previously established Florida as his domicile, it continues to be his domicile. *See Maple Island Farm v. Bitterling*, 196 F.2d 55, 58–59 (8th Cir. 1952) ("The presumption is in favor of an original or former domicile as against an acquired one . . . ." (quoting 28 C.J.S. *Domicile* § 16 (1941)). To rebut this presumption, the party alleging a subsequent change in domicile bears the burden of proof. *See id*. at 58. Thus, Inter-State must show that Eckerberg had the intent to abandon Florida and become a citizen of Missouri by clear and unequivocal evidence. *Ellis II*, 260 F.2d at 282 ("A citizen of a state does not change his citizenship by entering military service even though he is assigned to duties in another state or country, and regardless of the term of service, unless he indicates an intent to abandon such original domicile and adopt a new one." (quoting *Seegers v. Strzempek*, 149 F. Supp. 35, 36 (E.D. Mich. 1957))); *see also Bowman*, 267 F. Supp. at 313–14 (placing the burden on the defendant to prove a serviceman's domicile change by "clear and unequivocal" evidence).

Eckerberg testified that if he were to leave the Marines, he would return to Florida.[5] He presented evidence about the desirability of Florida as a place of

---

[5]Domicile requires an intent to remain for an "indefinite time" period notwithstanding "a floating intention to return" to another place in the future. *Gilbert v. David*, 235 U.S. 561, 569 (1915) (quoting Joseph Story, *Commentaries on the Conflict of Laws* § 46 (7th ed. 1872)). A person can establish a domicile even with the intention of moving to a different state. *Yeldell*, 913 F.2d at 537 (saying domicile does not require the "[i]ntention to remain there permanently"). Nevertheless,

retirement for military personnel. He introduced multiple years of Fitness Reports in which he requested to be reassigned to various promotional opportunities in places other than Missouri.[6] He also presented evidence that his wife suffers from trigeminal neuralgia, a condition that causes chronic pain in cold climates. Eckerberg testified that the cold weather in Missouri has strained their marriage due to its effects on his wife. He further presented evidence that he maintained his driver's license, his voter registration, his bank account, and his tax filings in Florida. Individually, none of these facts prove that Eckerberg intended Florida as his continued domicile at the time of filing. Collectively, however, they tend to show that Eckerberg did not intend to shift his domicile back to Missouri.

Inter-State points to several items in the record that could be construed to show Eckerberg's intent to make Missouri his domicile. Inter-State points to the hunting, fishing, and firearm licenses that Eckerberg obtained in Missouri. These, being one-year in duration, seem more consistent with Eckerberg lawfully pursuing hobbies during his three-year tenure at Fort Leavenworth than establishing an intent to remain in Missouri indefinitely. *See* Mo. Code Regs. Ann. tit. 3, § 10-5.220 ("Residents of

---

Eckerberg's testimony about retirement in Florida—while not conclusive of his Florida domicile—does provide support for the conclusion that he maintained the intention to return to his "home" of Florida after completing service. *See Bowman*, 267 F. Supp. at 313.

[6]In these Fitness Reports, Eckerberg frequently requested to be assigned to a "Joint Staff" position, which refers to Central Command positions in Tampa, Florida; Stuttgart, Germany; Halawa, Hawaii; Colorado Springs, Colorado; and Miami, Florida. He also requested positions in both the Atlantic and Pacific Fleet Marine Forces. As late as November 26, 2013, Eckerberg continued to request such positions. In his final Fitness Report before filing suit (dated June 16, 2014), Eckerberg provided "no preference" for a future transfer. Inter-State argues that this lack of preference shows an intent to remain in Missouri, but this evidence could also tend to show that Eckerberg no longer desired to seek a promotion due to disqualification because of his injuries.

Missouri . . . serving in the armed forces of the United States, and their immediate families residing with them, may receive resident permit privileges."). Additionally, Inter-State highlights that Eckerberg has two vehicles titled in Missouri, but this also seems more consistent with an intention to follow Missouri's vehicle registration laws. *See* Mo. Rev. Stat. § 301.020. Inter-State also asserts that the substantial support given and available to Eckerberg by family and friends *following the accident* in Missouri provided a compelling reason for Eckerberg to decide to stay in Missouri before filing his complaint. Even if this were a good reason to remain in Missouri, the facts simply do not support a conclusion that Eckerberg actually decided to remain in Missouri indefinitely.

Finally, Inter-State emphasizes that Eckerberg owns two properties in Missouri—a rental house in Platte City and a development property in Clay County. Eckerberg has maintained the rental property since 2007 as an investment, and standing alone this fact provides little evidence of his intent to make Missouri his home in 2014. More persuasive, however, is Eckerberg's purchase of 40 acres that he later re-zoned for development of a major subdivision. It may seem unlikely that Eckerberg would intend to create and manage a major real estate development in Missouri while living in Florida. However, Inter-State did not cross-examine Eckerberg about the purpose of this land purchase, its timing, or how he intended to manage its development from Florida. Thus, we are left only with an unverifiable suspicion that this purchase may indicate a desire to stay in Missouri. This does not rise to the level of "clear and unequivocal" proof necessary to overcome the presumption of Eckerberg's continued domicile in Florida. *See Meléndez–García*, 629 F.3d at 41. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Lesch v. United States*, 612 F.3d 975, 980 (8th Cir. 2010) (quoting *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985)). On this

-11-

record, we conclude that the district court's finding of fact that Eckerberg did not intend to make Missouri his domicile was not clearly erroneous.

Eckerberg was a domiciliary of Florida when he filed his complaint. Because Inter-State was a domiciliary of Missouri, the parties were completely diverse. The district court therefore had subject-matter jurisdiction.

## B. *Remittitur*

"Denial of a motion for remittitur is reviewed for a manifest abuse of discretion." *Hudson v. United Sys. of Ark., Inc.*, 709 F.3d 700, 705 (8th Cir. 2013). The district court can remit a jury verdict only when it is so grossly excessive that "there is plain injustice or a monstrous or shocking result." *Id.* (quoting *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 763 (8th Cir. 2003)). Inter-State argues that because the $4.5 million award is "grossly excessive" in light of the $59,000 in medical bills, the district court abused its discretion by denying Inter-State's motion for remittitur. We disagree.

"We are guided by the law of the forum state in weighing the excessiveness of a verdict." *Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1019 (8th Cir. 2007) (quoting *Peoples Bank & Tr. Co. v. Globe Int'l Publ'g, Inc.*, 978 F.2d 1065, 1070 (8th Cir. 1992)). In Missouri, remittitur is available if "the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." Mo. Rev. Stat. § 537.068. "If the evidence viewed in the light most favorable to upholding the ruling of the trial court . . . afford[s] reasonable and substantial support for the trial court's order or remittitur, then there could be no abuse of discretion and the trial court's action must be sustained." *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 37 (Mo. 2013) (quoting *Steuernagel v. St. Louis Pub. Serv. Co.*, 238 S.W.2d 426, 431–32 (Mo. 1951) (en banc)). Thus, if a damage award is supported by the evidence, we will not find the award excessive.

Inter-State argues that the damages award, especially in relation to lost wages, was excessive because Eckerberg has continued his employment with the Marines and he could potentially maintain that employment until retirement. Although Eckerberg testified that his job opportunities would be limited because of the accident and that he is likely unable to be deployed, Inter-State argues that "undeployable" is not equivalent to "unemployable." This argument, however, ignores the jury's option to credit testimony from an economist that established large economic losses even if Eckerberg remained employed but undeployable with the Marines. Further, the economist testified that Eckerberg's inability to fly eliminated his most lucrative career opportunity as a private-sector helicopter pilot, which was worth over $4 million. Even if Eckerberg remained employed by the Marines until retirement, the injuries sustained in the accident have substantially impaired his potential for career advancement. The economist estimated this loss to be worth up to $2.35 million. "The jury was entitled to determine what weight, if any, to give any of the expert testimony offered by the parties." *Niemiec v. Union Pac. R.R. Co.*, 449 F.3d 854, 859 (8th Cir. 2006). The jury had sufficient basis to find substantial economic losses.

Inter-State's damages objection also ignores the scope of the jury award, which also encompassed non-economic damages like the mental and physical effects of the crash. "Awards for pain and suffering are often 'highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms.'" *Hudson*, 709 F.3d at 705 (quoting *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1193 (8th Cir. 2000)).

> An appellate court should be extremely hesitant to overturn a jury verdict which includes damages for pain and suffering, which were included in the general verdict in this case. There is no precise or exact measuring stick for calculating general damages for pain and suffering. Although the jury should not pick a figure out of the air, exact compensation for pain and suffering is impossible.

*Taken Alive v. Litzau*, 551 F.2d 196, 198 (8th Cir. 1977). Our precedent supports upholding non-economic jury awards for situations in which pain and suffering are significant. In *Eich*, we reversed the district court's remittitur of a non-economic damages award of $200,000 to $10,000 for an employee that experienced a hostile work environment over a seven-year period because non-economic awards "should be committed to the sound discretion of the jury." 350 F.3d at 763 (quoting *Frazier*, 200 F.3d at 1193); *see also Ondrisek v. Hoffman*, 698 F.3d 1020, 1027 (8th Cir. 2012) (affirming a compensatory damage award of $3 million for "pain, suffering, and mental anguish"). Here, Eckerberg will be physically impaired for the rest of his life, and his injuries include both physical and emotional pain. With both economic and non-economic damages included in the general award, the total is not "monstrous, shocking, or grossly excessive." *Hudson*, 709 F.3d at 705.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____