# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-1522
_____

Linda A. Miller, M.D.

*Plaintiff - Appellee*

v.

Huron Regional Medical Center

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: June 11, 2019
Filed: August 30, 2019

_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.

_____

KELLY, Circuit Judge.

Huron Regional Medical Center (HRMC) appeals the district court's[1] denial of its motion for remittitur or a new trial following the jury's award of damages to Dr.

_____

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

Linda A. Miller, one of HRMC's former physicians. We conclude that the district court did not abuse its discretion and therefore affirm.

I

The Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§ 11101–11152 (2012), requires certain information about physicians to be reported to the National Practitioner Data Bank (NPDB). A health care entity such as HRMC must report whenever it "accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or (ii) in return for not conducting such an investigation or proceeding." § 11133(a)(1)(B). Another type of report must be filed whenever a medical malpractice claim is settled. See § 11131(a). NPDB reports are not available to the public but are available to state licensing boards and prospective employers. The HCQIA contains an immunity provision that states: "No person or entity . . . shall be held liable in any civil action with respect to any report made under this subchapter . . . without knowledge of the falsity of the information contained in the report." § 11137(c).

Dr. Miller began working for HRMC as a surgeon in 2004. In 2009, she executed a new three-year contract with HRMC (the Surgical Services Agreement or SSA). The SSA provided for termination without cause by either party on 180 days' notice. The SSA required Dr. Miller to maintain a valid medical license in South Dakota and full admitting privileges at HRMC. Decisions about physician appointments and privileges are made by HRMC's Board of Directors based on recommendations by the Medical Executive Committee (MEC). Members of the medical staff, including physicians, are governed by the Medical Staff Bylaws.

While working at HRMC, Dr. Miller settled a number of malpractice lawsuits, each of which triggered a NPDB report. At a regularly scheduled August 24, 2010

Board of Directors meeting, the Board received an update on pending litigation and asked the MEC to conduct a review of Dr. Miller's medical records "to determine any trends to be addressed, to be reported back to the Board." The MEC met on October 14, 2010, and agreed to conduct a three-month review of Dr. Miller's charts, followed by a reevaluation. That review ended on January 18, 2011. Although the MEC did not report any concerns with the first review, the Board requested that the MEC conduct a second three-month review.

While the second review was ongoing, Dr. Miller experienced two bad outcomes with patients. On April 25, 2011, the MEC decided to have Dr. Blessinger discuss the cases with Dr. Miller. According to Dr. Miller's testimony, Dr. Blessinger told her that the MEC recommended a voluntary reduction in her surgical privileges, in the hopes that it would appease the Board and avoid her termination. Dr. Blessinger testified that he did not ask Dr. Miller to reduce her privileges but "discussed with her that reducing her privileges might allow us to continue to have her practice medicine" with HRMC. Dr. Blessinger expressed his belief that a voluntary reduction in her privileges would not trigger a NPDB report.

That same day, Dr. Miller submitted a revised privilege checklist omitting abdominal surgeries. HRMC's CEO, John Single, consulted with the hospital's counsel and concluded that if the Board accepted Dr. Miller's reduction in privileges it would need to be reported to the NPDB. Single showed Dr. Miller a draft of the NPDB report, and Dr. Miller did not attempt to withdraw her privileges request. On April 29, 2011, the Board accepted Dr. Miller's reduction in privileges, and HRMC filed the NPDB report on May 11, 2011. The report stated: "Dr. Miller voluntarily surrendered a portion of her surgical privileges while the Medical Executive Committee was investigating her quality of care. The Board of Directors approved this surrender of certain privileges April 29, 2011." At the same April 29 meeting, the Board voted to terminate the SSA without cause per the 180-day provision.

Dr. Miller later resigned, but HRMC continued to pay her through October 30, 2011, which was the end of the 180-day period in the SSA. Dr. Miller remained unemployed for six months before accepting a job performing wound care in Florida. Prior to accepting that job, she had applied for a surgical position and was told she would not be able to get credentials because of the NPDB report filed as a result of her reduction in privileges.

Dr. Miller sued HRMC for breach of contract and defamation.[2] In her contract claim, Dr. Miller alleged that HRMC's request to reduce her privileges constituted corrective action, which created a right to a hearing under Sections 10.2(h)(iv), 10.2(i) and 11.2-2 of the Medical Staff Bylaws. On the defamation claim, she alleged that the MEC was not "investigating her quality of care" at the time she surrendered her privileges, making HRMC's NPDB report knowingly false. Dr. Miller sought compensatory and punitive damages.

At trial, one of Dr. Miller's experts, Dr. Lawrence Huntoon, presented evidence that HRMC had not complied with the Medical Staff Bylaws because it did not afford Dr. Miller a hearing prior to requesting a reduction in her surgical privileges. He also testified that the review being conducted of Dr. Miller's cases was not an "investigation" as that term is used in the Bylaws. As Dr. Miller was not "under an investigation . . . relating to possible incompetence or improper professional conduct," § 11133(a)(1)(B)(i), no NPDB report needed to be filed. Further, the NPDB report's statement that Dr. Miller surrendered her privileges while the MEC was "investigating her quality of care" was untrue.

Dr. Huntoon also opined on Dr. Miller's career prospects. He testified that a NPDB report indicating that a physician voluntarily reduced her privileges while

[2]Additional claims against HRMC and several individual doctors on the MEC were dismissed on summary judgment or by stipulation of the parties prior to trial.

-4-

under investigation would be "absolutely devastating" to the physician's career. Dr. Miller's credentialing expert, Carol Cairns, reviewed the contents of the NPDB report and called it the "kiss of death." HRMC's experts testified that what prevented Dr. Miller from working as a surgeon after her resignation was not the NPDB report but other weaknesses in her resume. For instance, Dr. Miller failed her board certification exam four times and was no longer eligible to sit for the exam. She had also accumulated eight malpractice settlements during her career.

Dr. Miller also presented a damages expert, forensic economist Don Frankenfeld. Frankenfeld estimated the amount that Dr. Miller would have earned had she obtained employment as a surgeon following her termination from HRMC and continued working until she was approximately 70. Frankenfeld based his estimates on Dr. Miller's 2010 tax returns—the last full year she was employed with HRMC—which showed her income as $191,117. Assuming she earned a similar salary, he estimated she would have earned $586,617 more employed as a surgeon between the time of her termination and trial and would have earned an additional $861,278 between trial and retirement.

After the close of Dr. Miller's case, HRMC moved for judgment as a matter of law on the defamation claim and on the request for punitive damages, but not on the contract claim. HRMC argued, among other things, that the HCQIA immunity provision in 42 U.S.C. § 11137(c) foreclosed liability on the defamation claim. The district court denied the motion after observing that, to find liability for defamation or award punitive damages, the jury would need to first conclude that HRMC had made a knowingly false statement. If it made such a finding, the HCQIA immunity defense would be inapplicable. As there was sufficient evidence to support a jury finding that the NPDB report was knowingly false, the district court denied the motion. It also declined counsel's passing suggestion to add a jury instruction on the immunity issue, noting that the verdict on the defamation claim turned on "the exact same" question.

At the charging conference the next morning, the parties agreed to a verdict form with a single compensatory damages section comprised of separate subsections for lost past wages, lost future earning capacity, and mental anguish, followed by a separate punitive damages section. The verdict form instructed the jury that, if it found in Dr. Miller's favor on either the defamation or contract claim, it could award any of the three types of compensatory damages. However, at the conference, Dr. Miller's counsel clarified that she was seeking only "[p]ast and future wages on the contract claim" because damages for mental anguish are not recoverable for a breach of contract. The parties therefore stipulated that if the jury found in favor of HRMC on the defamation claim and in favor of Dr. Miller on the contract claim, the court would strike any award of damages for mental anguish.

The jury found in favor of Dr. Miller on the contract claim and in favor of HRMC on the defamation claim. It awarded $586,617 in lost wages, $343,640 for lost future earning capacity, and $250,000 for mental anguish. Following the verdict, HRMC did not renew its motion for judgment as a matter of law. Consistent with the parties' agreement at the charging conference, the district court struck the award of damages for mental anguish but otherwise entered judgment consistent with the verdict, along with prejudgment interest.

HRMC moved for remittitur or a new trial. It argued that the jury improperly awarded damages for lost wages and lost future earning capacity on the contract claim. The district court denied the motion. It reasoned that HRMC had not objected to the final jury instructions or verdict form and had not raised any concerns about a potential award for lost future earning capacity when Dr. Miller's counsel stated at the charging conference that she was pursuing such damages for the contract claim. HRMC appeals the denial of this motion.

II

If a trial court determines that a jury award is excessive, it may order a new trial or condition a denial of a motion for a new trial on the plaintiff's acceptance of a remittitur. Fed. R. Civ. P. 59; see 11 Charles Alan Wright et al., Federal Practice and Procedure § 2815 (3d ed. 2012). Remittitur is not appropriate merely because the district court would have awarded a different amount than the jury. Lincoln Composites, Inc. v. Firetrace USA, LLC, 825 F.3d 453, 459 (8th Cir. 2016). Rather, "[t]he court orders a remittitur when it believes the jury's award is *unreasonable* on the facts." Ross v. Kan. City Power & Light Co., 293 F.3d 1041, 1049 (8th Cir. 2002) (quoting Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1331 (11th Cir. 1999)). A remittitur is reserved for cases "where the verdict is so grossly excessive as to shock the judicial conscience." Lincoln Composites, 825 F.3d at 459 (quoting Bennett v. Riceland Foods, Inc., 721 F.3d 546, 553 (8th Cir. 2013)). We review the denial of a motion for remittitur or a new trial for a manifest abuse of discretion. Eckerberg v. Inter-State Studio & Publ'g Co., 860 F.3d 1079, 1087 (8th Cir. 2017).

HRMC makes little attempt to argue that the jury's award of $930,257 is so grossly excessive that the district court committed a manifest abuse of discretion in failing to order remittitur for a lesser amount. The jury's award of $586,617 in lost wages precisely tracks the analysis submitted by Frankenfeld, Dr. Miller's damages expert. The award of $343,640 for loss of future earning capacity roughly matches what Frankenfeld testified Dr. Miller would earn if she worked as a surgeon until she was 65, but was significantly less than the $861,278 that Dr. Miller sought, based on the assumption that she would work until the age of 70. HRMC does not challenge any of these figures as factually unreasonable.

Instead, HRMC argues that *any* award of damages on the breach-of-contract claim would violate South Dakota law because Dr. Miller was paid through the end of the SSA and the SSA was never breached. See Bad Wound v. Lakota Cmty.

-7-

Homes, Inc., 603 N.W.2d 723, 726 (S.D. 1999) ("[I]t is well settled that the only damages which may be recovered by an employee who has been wrongfully discharged is the balance of the salary due under the employment contract less any sums the employee was able to earn during the remainder of the contract period." (cleaned up)). But this argument rests on the faulty premise that the relevant contract is the SSA, not the Medical Staff Bylaws. In ruling on HRMC's motion for summary judgment, the district court held that Dr. Miller's contract claim alleged a breach of the Bylaws and that the Bylaws were an independently enforceable contract under South Dakota law. Miller v. Huron Reg'l Med. Ctr., Inc., 145 F. Supp. 3d 873, 880–82 (D.S.D. 2015). Dr. Miller's evidence at trial also focused on the Bylaws violation, not the SSA. At this juncture, HRMC is foreclosed from challenging the district court's summary judgment ruling that the Bylaws were the relevant contract. See Ortiz v. Jordan, 562 U.S. 180, 183–84 (2011) (holding that a party cannot "appeal an order denying summary judgment after a full trial on the merits").

HRMC further argues that the damages award violates the immunity provision of the HCQIA. It asserts that the jury's verdict in its favor on the defamation claim means that HRMC did not knowingly submit a false NPDB report, and thus any damages flowing from the report are not recoverable. See 42 U.S.C. § 11137(c). This argument assumes that any injury suffered by Dr. Miller resulted from the NPDB report, not from the Bylaws violation standing alone, and that the jury's verdict on the defamation claim necessarily means the jury concluded that the NPDB report was not knowingly false.

Even if HRMC's analysis of the HCQIA immunity provision is correct, HRMC failed to properly preserve the issue. A motion for remittitur is not a vehicle for challenging the legal sufficiency of the evidence supporting a claim. To do that, a party must file a motion under Federal Rule of Civil Procedure 50(a) prior to submission of the case to the jury. See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 396 (2006); W. Plains, L.L.C. v. Retzlaff Grain Co. Inc., 870 F.3d

-8-

774, 782 (8th Cir. 2017). Rule 50(a) "allows the trial court, after a party has been fully heard on an issue, to resolve the issue against that party and enter judgment accordingly if a reasonable jury could not find in that party's favor." White v. Union Pac. R.R. Co., 867 F.3d 997, 1000 (8th Cir. 2017). Rule 50(b) allows the moving party to renew its Rule 50(a) motion after the jury renders its verdict, but a party may not advance new arguments in its Rule 50(b) motion that were not properly raised in its Rule 50(a) motion. Milhauser v. Minco Prods., Inc., 701 F.3d 268, 273 (8th Cir. 2012).

HRMC's argument attacks the legal sufficiency of the breach-of-contract claim, so it was required to raise that argument in its Rule 50(a) motion. HRMC asserts that its failure to do so should be excused because it was not until after the jury rendered its verdict that it realized the applicability of the immunity defense to the contract claim. But the potential applicability of the immunity defense should have been apparent well before then. Dr. Miller's damages evidence focused on the effects of the NPDB report. In denying HRMC's Rule 50(a) motion on the defamation claim, the district court stated that both applicability of the immunity defense and liability for the defamation claim turned on whether the NPDB report was knowingly false, and that there was sufficient evidence to send that factual question to the jury. Faced with that statement, HRMC should have known to raise the immunity defense to the contract claim as well, in the event the jury rendered a verdict in Dr. Miller's favor on the contract claim but in favor of HRMC on the defamation claim. Rule 50(b) would have allowed HRMC to renew its motion after trial in the event of a split verdict.

Indeed, the parties expressly contemplated this type of split verdict the very next day at the charging conference. They stipulated that, should it occur, the court would strike any award of damages for mental anguish. They did not address, however, whether the court should do anything about awards of lost wages or lost future earning capacity, both of which Dr. Miller was seeking for the contract claim. Instead, HRMC raised no objection to the jury instructions or verdict form, which

indicated that the jury was free to award those forms of damages "[i]f [it] found in favor of Dr. Miller on *either* the breach of contract claim or the defamation claim." (Emphasis added). The final jury instruction on compensatory damages told the jury that it could award Dr. Miller damages for the contract claim in "the amount of money that will reasonably and fairly compensate Dr. Miller for all detriment legally caused by the breach, or which, in the ordinary course of things, would be likely to result from the breach." These instructions accurately stated South Dakota law, and HRMC has never argued otherwise. See Stern Oil Co., Inc. v. Brown, 908 N.W.2d 144, 151 (S.D. 2018).

HRMC's failure to raise the HCQIA immunity defense to the breach-of-contract claim in its Rule 50(a) motion deprives this court of the power to direct the district court to enter a contrary judgment. See Unitherm Food Sys., 546 U.S. at 400–01; Cone v. W. Va. Pulp & Paper Co., 330 U.S. 212, 217–18 (1947). At best, our review would be "strictly limited" to application of the plain-error doctrine to prevent a manifest miscarriage of justice. B&B Hardware, Inc. v. Hargis Indus., Inc., 912 F.3d 445, 450 (8th Cir. 2018) (quoting Karjala v. Johns-Manville Prods. Corp., 523 F.2d 155, 157 (8th Cir. 1975)). We find no such injustice here, as HRMC had ample opportunity to raise this defense but failed to do so until it was too late.

We affirm the judgment of the district court.

_____